[No. 39717.    Department Two.    May 2, 1968.]

REEFER QUEEN COMPANY, INC., *Respondent*, v. MARINE CONSTRUCTION AND DESIGN COMPANY, *Appellant*.*

*Reported in 440 P.2d 448.

*Skeel, McKelvy, Henke, Evenson & Uhlmann, Frederick V. Betts, James M. Lindsey, Jr., Graham, Dunn, Johnston & Rosenquist, Ben J. Gantt, Jr.,* and *Jack G. Strother,* for appellant.

*Broz, Long, Mikkelborg, Wells & Fryer, Robert O. Wells, Jr.,* and *Jacob A. Mikkelborg,* for respondent.

LANGENBACH, J.†—This is a products liability action commenced by plaintiff to recover damages for loss of use and profits of its tuna fisher, the Reefer Queen. The plaintiff-respondent will be referred to as the plaintiff corporation. The action was brought against the J. M. Martinac Shipbuilding Corporation, referred to herein as Martinac, and Marine Construction and Design Company, referred to herein as Marco. Marco joined its subcontractor, Mantel Gear Works, Inc., referred to herein as Mantel, as a third-party defendant.

Plaintiff corporation owned an army hull which it desired to convert into a tuna fishing vessel. It contracted with Martinac to make such a conversion. Martinac purchased a purse seine winch from Marco for installation in the converted vessel. The winch required three case-hardened shafts for proper operation. Marco sent a written work order with these shafts to Mantel to grind and case harden[1] the shafts.

(It later developed that Mantel, by its negligence, merely ground the exterior of the shafts and did not case harden them. Upon the return of the shafts in that condition, Marco inserted them into the winch without any inspection and delivered the winch to Martinac for installation on the tuna fisher.)

While off the coast of Colombia on its maiden voyage, the

---

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

[1] In case hardening, the outer surface of a shaft is made extremely hard so that it will be suitable for use as a bearing surface. The process affects only the outer surface of the shaft and leaves the core of the shaft soft and tough.

winch failed while the Reefer Queen was actively engaged in catching tuna. This failure necessitated a trip to the Canal Zone, where one shaft was found defective and was removed and a new one was installed. The vessel then returned to the fishing grounds. A little later, while attempting to close the seine, the winch failed again, causing the loss of the fish already within the net. The vessel again returned to the Canal Zone for repairs. Marco was notified and it sent an official down to make the repairs. Upon examination, he discovered that the two remaining original shafts had not been case-hardened. They were removed, and proper case-hardened shafts were inserted. No further troubles ensued with reference to the winch. But, because of these two winch failures, the vessel lost 11 days of tuna fishing.

Marco generally denied all allegations of negligence and cross-claimed against Mantel for failure to case harden the shafts which resulted in these breakdowns. Mantel, in turn, generally denied the third-party allegations.

The case was tried to a jury, which found for the plaintiff corporation against Marco. The action was dismissed with prejudice against Martinac. The jury also returned a verdict for Marco against Mantel without any award for damages. After judgment was entered for plaintiff corporation against Marco, the court granted a new trial to Marco against Mantel.

Marco has appealed in this action, while the appeal of Mantel for the granting of a new trial to Marco was taken separately. It was argued subsequent to this appeal on the same day.

The facts tended to show that Martinac contracted to convert the army hull into a tuna fisher for plaintiff corporation. The agreement included the purchase and installation of a purse seine winch which was manufactured and supplied by Marco to Martinac. Such a winch contained three idler shafts of soft steel interiors. These were required to be ground to certain specifications and then to be case-hardened on the surface to support the operations

of certain bearings resting thereon. Marco did not have the necessary equipment to grind or case harden such shafts. Accordingly, Marco delivered these shafts to Mantel with a specific written work order to grind and case harden them. Mantel ground and returned these shafts without being case-hardened. Marco then inserted them into the winch, without any inspection, and delivered the winch to Martinac for installation in the Reefer Queen.

In purse seining, a net of 500 fathoms (3,000 feet) in length is used to encircle a school of tuna when located in the ocean. The net is 46 fathoms (276 feet) deep. It is fitted with cork floats on top and lead weights on the bottom to hold it vertical in the water. When a school of tuna is located, a motor launch is lowered, which holds one end of the net stationary while the vessel circles around the school to the left until the circle is completed at the launch. The two ends of the lines in the top and bottom of the net are attached to drums on the winch and the lines are drawn taut and the net is tightened, or pursed, so as to contain the fish which are subsequently hauled aboard the vessel and stowed away.

The purpose of the winch is to draw tight the towline on top of the net and the purse line on the bottom of the net, which line is held in place in rings known as bridles. The winch also lowers and lifts the motor launch and assists in stowing the net between catches.

In December, 1962, when the Reefer Queen was 27 days out on the first trip from San Diego, the winch failed. This was during a set of the net for fish. The winch was disassembled, and one shaft was found to be defective. The vessel went to the Canal Zone for repairs. Its owner was notified, who informed Marco, which sent the replacement parts for the winch. The vessel returned to the fishing grounds, and, in January, when 43 days out, during another set for fish, the winch failed again during pursing operations and 20 tons of fish escaped from the net. The motor launch could not be lifted aboard and had to be towed behind while returning to the Canal Zone for further repairs.

There, the winch was torn down again, and the two remaining original shafts were found to be defective. Upon notice, one of Marco's officials brought replacement parts. After examination, he discovered that the failure of the winch was due to the fact that these shafts had not been case-hardened, as requested of Mantel. Thereafter, no further trouble ensued with the winch's operations.

The Reefer Queen returned to its home port after a voyage of 101 days, 11 of which were lost by reason of the winch failure. It returned with a cargo of 455 tons. It was for the loss of the catch of these 11 days and the extra time involved in this trip that the action was brought.

There was testimony that the Reefer Queen had made 57 sets but caught no fish in 27 of them. They caught 438 tons of tuna, which averaged 14.6 tons for each of the 30 sets. The trip should have been completed within 50 days without mechanical trouble. The owner testified that they had lost about 550 tons by reason of the winch failure. In evidence were the logs of other tuna fishing boats which had been in the same general area at the same time. These were considered as bearing upon the probabilities and possibilities of the potential catch of the Reefer Queen had it suffered no breakdown. There was additional testimony that the average price per ton of tuna as caught by the Reefer Queen was $270 a ton. The jury's verdict was $60,750, which would be the value of approximately 225 tons of tuna fish.

There are 11 assignments of error. The two main ones argued are (1) plaintiff cannot recover the crew's share of prospective profits under the pleadings, and (2) the court erred in admitting the owner's opinion on the loss of catch and prospective profits.

The first assignment argued is against instruction No. 17:

> You are instructed that the plaintiff corporation, as the employer of the Reefer Queen's crew, is entitled to recover the gross value of fish production lost because of the winch breakdowns, less any expenses which would have been incurred in the catching of such fish.

Therefore, if you find in favor of the plaintiff as against one or both of the defendants, you are instructed not to deduct from the damages you find, the value of the crew's prospective share.

■ The correctness of this instruction is substantiated by the decision in *Carbone v. Ursich*, 209 F.2d 178 (9th Cir. 1953). In this case, the court determined, at 181:

[W]e are satisified that the Robins Dry Dock case did not operate to establish a rule contrary to the previously recognized doctrine that a respondent in a case of this character, must respond in damages for the loss of the fishermen's lay share. We are of the opinion that this liability is enforceable not only at the suit of the owner of the fishing vessel, but also that the fishermen themselves may recover.

We recognize that there is authority contrary to the *Carbone* position, particularly in two recent United States District Court decisions—*Henderson v. Arundel Corp.*, 262 F. Supp. 152 (D. Md. 1966); *Guarrasi v. Panama Canal Co.*, 271 F. Supp. 678 (Canal Zone 1967). Nonetheless, under the facts and circumstances of the present case, we believe that the *Carbone* rule should be applied.

The crew of the Reefer Queen was closely allied with the vessel. Extensive preparations were made prior to sailing so that the vessel and crew might be unified into a productive tuna operation. Several members of the crew, although residents of the San Pedro-San Diego area, spent 6 weeks at the Martinac shipyards in Tacoma to become acquainted with the vessel, participate in sea trials, and man the vessel on the trip from Tacoma to San Diego. At San Diego, the entire crew spent approximately 1 month together making the seine and otherwise preparing the Reefer Queen for tuna fishing.

The crew of the Reefer Queen was obliged to stay with the vessel at all times during the voyage. From the products of this trip, the members of the crew were entitled to their recognized share. The jury was instructed not to deduct the value of the crew's share from any loss incurred on this voyage. This would indicate that the crew's share

was included in this verdict. In order that there be no unjust enrichment of the owner for the crew's wages, the plaintiff corporation must be held to be a trustee for the crew in the matter of the computation and distribution of earnings.

■ The testimony showed that the vessel's owner incurred certain specific costs of general expenses in the operation of the Reefer Queen. After these were properly deducted, the crew's share was computed at 48 per cent, and the owner's at 52 per cent, of the balance.

The second assignment argued challenged the propriety of the trial court's admission of the owner's opinion on the loss of catch and prospective profits. The matter of his qualifications as an expert witness was within the discretion of the trial court, and we shall not disturb its ruling without a manifest showing that that discretion has been abused. *Johnson v. Harvey*, 44 Wn.2d 455, 268 P.2d 662 (1954); *Hill v. C. & E. Constr. Co.*, 59 Wn.2d 743, 370 P.2d 255 (1962). Under the evidence here, the owner was in active management of plaintiff corporation and possessed a background in the fishing industry, including personal fishing experience. The weight accorded to his testimony was a matter to be resolved by the jury.

However, there is additional testimony on the issue of loss of catch in the form of a review of the activities of other tuna fishing boats in the same general area at the same time. There was evidence as to the number of fish caught immediately prior to the first breakdown and that the Reefer Queen was in a school of tuna at that time. The proof showed that, after the first repairs had been made, a definite number of fish had been caught on each set until the winch broke down a second time.

The catch reported by the other boats at that time would indicate that the Reefer Queen might have continued with its catch in each school of tuna had it not been for these untimely interruptions.

Thus the verdict was not entirely on the basis of the owner's individual opinion as to the amount of loss, but also upon the proof shown by the actual results, as stated

in their logs, of other vessels so engaged. The verdict of the jury indicated that they did not consider the owner's opinion evidence as conclusive. The verdict equalled about 225 tons of fish, less than half the owner's computation.

Marco also argued that it was not negligent in the construction of the winch used; that such negligence was that of its subcontractor, Mantel. Nevertheless, the jury found both Marco and Mantel negligent by its verdict. Certainly someone was negligent in the manufacture and furnishing of these admittedly defective shafts. The apportionment was between these two tort-feasors, as the jury so found in its second verdict. That matter is the subject of the second appeal.

In spite of this evidence, appellant Marco claims that the plaintiff corporation failed to prove damages with reasonable certainty, particularly since the Reefer Queen did not have a prior profit history. However, this court has stated that, where the fact of damage is firmly established, the wrongdoer is not free of liability because of difficulty in establishing the dollar amount of damages. *Sigman v. Stevens-Norton, Inc.*, 70 Wn.2d 915, 425 P.2d 891 (1967). In the case of *Larsen v. Walton Plywood Co., Inc.*, 65 Wn.2d 1, 390 P.2d 677 (1964), the court stated, at 16:

> A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and
>
> ". . . if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment. . . ."

Lost profits are also a permissible element of damages. To this effect the court, in *Larsen*, continued at 17:

> The rule is succinctly stated in *Barbier v. Barry*, 345 S. W. (2d) 557, 563 (Tex. Civ. App. 1961), as follows: ". . . lost profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses. . . ." Its rationale is stated as follows: ". . . Where the fact is well established that profits would have been made and

the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences. . . ." 5 Corbin on Contracts § 1023, p. 133.

Accord: *Kadiak Fisheries Co. v. Murphy Diesel Co.,* 70 Wn.2d 153, 422 P.2d 496 (1967).

It cannot be disputed that Marco furnished plaintiff corporation, through Martinac, with a defective winch. The breakdown of the winch and the interruptions of the two fishing operations were directly responsible for the loss of tuna fish, and indirectly for the loss of profits on this voyage. This loss was the direct result of the joint negligence of Marco and Mantel in failing to case harden the shafts prior to placing them inside the winch. Therefore, the cause of loss having been clearly established, a liberal rule for the determination of the amount of damage was permissible. The computation of the jury in its verdict was well within the limits of testimony concerning the damages sustained.

Our comprehensive review of the entire record satisfies us that there was substantial evidence presented upon the issues of negligence, breach of the implied warranties of fitness, and damages to warrant their submission to the jury and to sustain the jury's verdict. Accordingly, the judgment is affirmed.

FINLEY, C. J., WEAVER, ROSELLINI, and McGOVERN, JJ., concur.