[No. 5551–1–II.   Division Two.   December 23, 1983.]

SHAHNAZ THOMPSON, *Appellant,* v. GRAYS HARBOR COMMUNITY HOSPITAL, ET AL, *Respondents.*

*John A. Hoglund,* for appellant.

*A. Clarke Johnson, Jr.,* for respondents.

REED, J.—Dr. Shahnaz Thompson urges us to restore a jury verdict awarding her $90,000 damages against Grays Harbor Community Hospital for tortious interference with her medical practice. The verdict was set aside by the trial court as it granted the hospital's motion for judgment n.o.v. and in the alternative, a new trial. The hospital defends the judgment n.o.v. on the grounds: (1) that the evidence was insufficient to support the jury's verdict; and (2) the verdict, based on vicarious liability, was inconsistent with the

jury's exoneration of the hospital's named agents. The hospital defends the granting of a new trial on the ground that it was within the trial court's discretion *to do so.* For reasons that follow, we disagree and reverse.

Dr. Thompson, a pediatrician, opened a practice in Grays Harbor County in 1975. At first her pediatrics work load increased. Later, that portion of her practice attributable to pediatrics took a decidedly downward trend. Dr. Thompson believed this decline was caused by doctors and other staff persons at Grays Harbor Community Hospital intentionally demeaning her and interfering with her practice. She brought this lawsuit naming the hospital and several of the hospital personnel individually as defendants. Dr. Robert Patton, an economics expert appearing on behalf of Dr. Thompson, testified that during the period of time the arguably tortious conduct occurred, Dr. Thompson's pediatrics practice deteriorated drastically. He estimated that this decline represented a loss to Dr. Thompson in excess of $100,000. Rebuttal testimony, however, suggested that the decline coincided with an increase in the number of pediatricians practicing in the area and with the plaintiff's loss of privileges at Grays Harbor Community Hospital. The hospital was a primary source of new pediatric patients. In addition, other witnesses expressed the opinion that Dr. Thompson lost patients because of her abrasive personality and questionable medical practices and beliefs.

■ We consider first the trial court's order granting judgment notwithstanding the jury's verdict. When ruling on a motion for judgment n.o.v., a trial judge exercises no discretion. *Sepich v. Department of Labor & Indus.,* 75 Wn.2d 312, 450 P.2d 940 (1969). Indeed, the motion must be denied unless the court can say, as a matter of law, after viewing the evidence and reasonable inferences therefrom most favorably to the nonmoving party, there is no substantial evidence supporting the verdict. *Belli v. Shaw,* 98 Wn.2d 569, 576, 657 P.2d 315 (1983); *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980). Substantial evidence must be more than a mere scintilla and be of such character

as would convince an unprejudiced, thinking mind of the truth of the declared premise. *Arnold v. Sanstol,* 43 Wn.2d 94, 98, 260 P.2d 327 (1953). In other words, the motion for judgment n.o.v. should have been denied if Dr. Thompson established a prima facie case. *See Hemmen v. Clark's Restaurant Enters.,* 72 Wn.2d 690, 434 P.2d 729 (1967).

■ To establish a prima facie case, Dr. Thompson had the burden of producing evidence that she

> had a relationship with others contemplating a contract, with at least a reasonable expectancy of fruition, that this relationship was known, or reasonably apparent, to the interferor, and that the interference which caused the termination of the relationship or expectancy was intentional.

*King v. Seattle,* 84 Wn.2d 239, 247, 525 P.2d 228 (1974).[1] Further, Dr. Thompson was required to produce evidence that the tortious acts of the hospital's agents were the proximate cause of her damages—damages which Dr. Thompson also had to establish with reasonable certainty.

Looking at the evidence in a light most favorable to Dr. Thompson, as we must, we conclude that there was sufficient evidence to establish a prima facie case of tortious interference with her business relationships and expectations. Various parents testified they took their children to the emergency room at Grays Harbor Community Hospital and asked for Dr. Thompson. According to the witnesses the hospital staff made them wait longer, told them falsely Dr. Thompson was not available and made disparaging remarks about her. In some cases the parents were encouraged to have their children treated by the house physician instead of by Dr. Thompson. Some of the parents followed this advice.[2] If believed, this evidence suffices to establish

---

[1]The court gave several jury instructions on the theory of tortious interference with a business relationship or expectancy. Neither party has assigned error to these instructions. Although both parties on appeal cite to *King v. Seattle, supra,* these instructions thus became the law of the case.

[2]For example, witness Caroline Young testified as follows:

"Q. What was the nurse's response to your indication that you were interested

the elements of the tort of intentional interference with Dr. Thompson's business relationships and expectancies, as that tort was defined for the jury. It also establishes injury through loss of patients.

The more troublesome proof is of the causal link between the dramatic downturn in Dr. Thompson's pediatric practice and the tortious conduct of hospital employees. The evidence on this issue was highly conflicting. The hospital presented evidence forcefully suggesting that there were other or additional reasons why Dr. Thompson's practice floundered. We must, however, disregard conflicting evidence unfavorable to Dr. Thompson. Looking only at the tortious conduct of the hospital staff and the coinciding decline in Dr. Thompson's practice, it is within the realm of reasonable inference that the tortious conduct was the proximate cause of the business decline. A verdict does not rest on speculation or conjecture when founded upon reasonable inferences drawn from circumstantial facts. *State Farm Mut. Ins. Co. v. Padilla,* 14 Wn. App. 337, 540 P.2d 1395 (1975).

---

in Dr. Thompson?

"A. Well, the nurse said that it wasn't the best choice I could have made, that Dr. Thompson—it would cost me $40 for her just simply to walk across the parking lot before she ever looked at my son. . . .

"Just for her to walk across the parking lot she will charge, and then when the babies were born she ran all kinds of unnecessary tests on them, evidently—she never actually came out and said it but the indication was for the monetary compensation that she would get from this.

"Q. Did the nurse ever suggest that you should not choose Dr. Thompson as a pediatrician?

"A. Yes, she did.

"Q. And how did she do this?

"A. She said—I was kind of in awe hearing all this, and she said, you know, you don't have to take Dr. Thompson. You can have Dr. Koeniger look at the baby while he's in the hospital, you know, I can get him to look at him for you and then when you get out you can take him to your regular general practitioner.

"So after hearing all this I said okay, well maybe that's what I better do. ". . .

"She said, would you like me to call downstairs and have the name changed on the papers from Doctor Thompson to Doctor Koeniger? I said well, if you can do it okay."

█ The only element of a prima facie case that remains unsettled is whether Dr. Thompson established her damages with reasonable certainty. Regarding her claimed economic loss, our inquiry need go no further than the testimony of Dr. Robert Patton. He testified that the decline in Dr. Thompson's practice represented a loss exceeding $100,000. Added to this was testimony that Dr. Thompson suffered mental distress, anguish and inconvenience, elements which the jury was instructed it could consider in awarding her compensation. Consequently, there was substantial evidence from which a jury could have fixed the amount of Dr. Thompson's loss with reasonable certainty. *Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 554 P.2d 1041 (1976); *Reefer Queen Co. v. Marine Constr. & Design Co.,* 73 Wn.2d 774, 440 P.2d 448 (1968).

Although Dr. Thompson presented sufficient evidence to establish a prima facie case, judgment notwithstanding the verdict must stand if there are circumstances which relieve the hospital of liability as a matter of law. *Cf. King v. Seattle, supra.* In her lawsuit, Dr. Thompson named certain doctors and nurses, employees of Grays Harbor Community Hospital, as individual defendants. All of the named employees were exonerated either by dismissal prior to submission of the case to the jury, or by the verdict. Consequently, the hospital maintains that it is relieved of any liability it might otherwise have under the theory of respondeat superior[3] because of the rule of *Doremus v. Root,* 23 Wash. 710, 716, 63 P. 572 (1901): "[I]f the employee who causes the injury is free from liability therefor, his employer must also be free from liability." *See also Brink v. Martin,* 50 Wn.2d 256, 310 P.2d 870 (1957); Restatement (Second) of Agency § 217B(2) (1958); Annot., *Inconsistent Verdict—New Trial,* 16 A.L.R.2d 969 (1951). Dr. Thompson, however, argues that the rule of *Doremus*

---

[3]At trial, plaintiff sought to hold the hospital on a theory of vicarious liability only. No independent ground was asserted, *see* Restatement (Second) of Agency § 217B(2), comment *d* (1958), and no instructions were given on any other theory.

does not control in the instant context because the jury could have based the hospital's derivative liability on the tortious conduct of certain unnamed employees. Specifically, Dr. Thompson points to the testimony of various witnesses implicating unidentified nurses and other hospital staff in arguably tortious conduct.

■ We agree with Dr. Thompson. The *Doremus* rule has no application where the liability of the principal is not based *solely* on the acts of the named agent. *Hansch v. Hackett,* 190 Wash. 97, 66 P.2d 1129 (1937); *Senske v. Washington Gas & Elec. Co.,* 165 Wash. 1, 4 P.2d 523 (1931). The *Hansch* case was a negligence action against a doctor and a hospital. The court upheld a jury verdict which exonerated the doctor but found the hospital liable, because the proof was such that the jury could have found one or more of four other hospital employees negligent. Thus, a finding that the only named employee was not negligent did not ipso facto release the hospital from liability. *Hansch,* 190 Wash. at 101–02. In the instant case testimony establishing tortious conduct of other unnamed employees of the hospital was admitted without objection. Thus, the issue of liability based on these acts was "tried by . . . implied consent of the parties . . . as if [it] had been raised in the pleadings." CR 15(b). *Fenton v. Contemporary Dev. Co.,* 12 Wn. App. 345, 349, 529 P.2d 883 (1974); *Meeker v. Howard,* 7 Wn. App. 169, 175, 499 P.2d 53 (1972). As stated in *Curtis v. Puget Sound Bridge & Dredging Co.,* 133 Wash. 323, 326–27, 233 P. 936 (1925), which is quoted in length in *Senske*:

> [A]lthough it is true that the respondents drew their complaint on the theory that Case was the one who, as a representative of the appellant, was guilty of the negligent acts, the testimony introduced alters the situation, and it is upon the testimony in the case and not upon the allegations in the complaint that, under the rules of practice in this court, the issue must be determined.

Although the proof on this theory of liability is a bit thin, there is sufficient evidence, with the reasonable inferences

to be drawn therefrom, to support the verdict. Dr. Thompson and other witnesses testified as to the conduct and statements of unnamed employees which tended to prove they meant to discourage patronage of Dr. Thompson. This evidence, although quantitatively less, essentially is of the same character as that presented against the named agents who were exonerated. Further, the hospital did not refute either that such conduct occurred or that these unnamed employees were acting within the scope of their employment. Consequently, the jury was entitled to disregard the evidence against the named but exonerated employees, yet find the hospital liable under the instructions for the acts of its unnamed employees. *Hansch v. Hackett, supra.*

The judgment n.o.v. must be reversed.

■ Pursuant to CR 50(c), the trial judge alternatively ordered a new trial. Unlike the granting of a judgment n.o.v., the granting of a new trial involves the exercise of sound discretion on the part of the trial judge. *Bunnell v. Barr,* 68 Wn.2d 771, 415 P.2d 640 (1966); *Sargent v. Safeway Stores, Inc.,* 67 Wn.2d 941, 410 P.2d 918 (1966). Generally, an order granting a new trial will not be disturbed on appeal absent an abuse of discretion. *Olpinski v. Clement,* 73 Wn.2d 944, 442 P.2d 260 (1968); *State v. Marks,* 71 Wn.2d 295, 301–02, 427 P.2d 1008 (1967). However broad this discretion may be, it is not without limits. It is also well established that discretion does not permit the trial court to weigh the evidence and substitute its judgment for that of the jury simply because it disagrees with the verdict. *Bunnell v. Barr, supra; Knecht v. Marzano,* 65 Wn.2d 290, 292–93, 396 P.2d 782 (1964). Cases dealing with this issue repeatedly emphasize that:

It is the province of the jury to weigh the evidence, under proper instructions, and determine the facts. It is the province of the jury to believe, or disbelieve, any witness whose testimony it is called upon to consider. If there is substantial evidence (as distinguished from a scintilla) on both sides of an issue, what the trial court believes after hearing the testimony, and what this court believes after reading the record, is immaterial. The

finding of the jury, upon substantial, conflicting evidence properly submitted to it, is final.

*Rettinger v. Bresnahan,* 42 Wn.2d 631, 633–34, 257 P.2d 633 (1953), quoted in *Bunnell v. Barr, supra* at 777. *See also State v. Franks,* 74 Wn.2d 413, 417–18, 445 P.2d 200 (1968), and cases cited therein. Further, it has been said that

> [t]o warrant and justify the exercise of the permitted discretion, the verdict must be so manifestly inconsistent and irreconcilable with the total evidentiary composition—viewed in the favorable light required—as to compel the conclusion that the moving party has been deprived of a fair trial.

*State v. Hall,* 74 Wn.2d 726, 727, 446 P.2d 323 (1968); *Alpine Indus., Inc. v. Gohl,* 30 Wn. App. 750, 756, 637 P.2d 998, 645 P.2d 737 (1981). With these rules in mind, we will examine each of the grounds enumerated by the trial judge for granting a new trial.

██ The trial court's first ground for granting a new trial was that the verdict was contrary to the law and evidence. A verdict is not contrary to law unless it can be said that "the verdict of the jury was contrary to the law as laid down by the court, or, in other words, against instructions." *State v. Brent,* 30 Wn.2d 286, 289, 191 P.2d 682 (1948). The trial court reasoned that, as a matter of law, the hospital could not be found liable when the named parties had been exonerated, relying upon *Doremus v. Root, supra.* However, the court's instruction on vicarious liability of the hospital for acts of its employee/agents did not limit that liability to the acts of the named individual defendants. No exception was taken to this instruction, nor was any objection made when plaintiff's counsel argued for exactly this result in his summation based on the instructions. As we have shown, it was not inconsistent, nor contrary to law, for the jury to exonerate the named defendants and find the hospital liable. *Hansch v. Hackett, supra.*

The trial court's second ground, that the verdict was contrary to the evidence, is also untenable. If substantial

evidence is presented on both sides of an issue, the finding of the jury is final and the trial court's decision to grant a new trial because the judge disagrees with the verdict constitutes an abuse of discretion. *State v. Williams,* 96 Wn.2d 215, 227, 634 P.2d 868 (1981), citing *Bunnell v. Barr,* 68 Wn.2d 771, 777, 415 P.2d 640 (1966). Our previous determination that the evidence was sufficient to withstand a motion for judgment n.o.v. disposes of this claim. The trial court's disagreement with the verdict cannot alone justify granting a new trial.

■ Another stated ground for granting a new trial was that the verdict was based on passion and prejudice. The trial court's reasoning appears to have been that a verdict of $90,000 against the hospital is excessive if liability arises only from acts of the unnamed agents. In other words, because the latter's conduct allegedly was so minimal when compared to the activities of the named doctors and nurses who were dismissed, that such conduct could hardly account for such a large recovery. This is the argument strenuously urged by the hospital on appeal, the theory being that the jury must have held the hospital responsible for damages caused by both the named defendants who were dismissed, and the unnamed employees. This, of course, we will never know.

The general rule is that "the passion and prejudice be of such manifest clarity as to make it unmistakable." *James v. Robeck,* 79 Wn.2d 864, 870, 490 P.2d 878 (1971). If the award is reasonably within the range of proven damages, a finding of passion and prejudice is improper. *James v. Robeck, supra; Beam v. Beam,* 18 Wn. App. 444, 569 P.2d 719 (1977). Dr. Thompson presented evidence of economic loss in excess of $90,000. In addition, the jury was authorized to award damages for Dr. Thompson's mental anguish, discomfort and inconvenience. Because the verdict was general in form and the damages unsegregated, we have no way of knowing what the jury allowed for economic loss on the one hand, or for Dr. Thompson's general damages. As in *Baxter v. Greyhound Corp.,* 65 Wn.2d 421, 438, 397 P.2d

857 (1964), we are unable to find the damages awarded so far "exceeds any rational estimate or plausible explanation . . . as to unerringly point to passion and prejudice." *See also Rasor v. Retail Credit Co.,* 87 Wn.2d 516, 554 P.2d 1041 (1976).

Finally, although it is questionable whether the trial court complied with CR 59(f), which requires specific references to matters relied on, whether on or off the record, and "definite reasons of law and facts" for the court's order, *see Knecht v. Marzano,* 65 Wn.2d 290, 396 P.2d 782 (1964), so that we need extend our review, we note its order contains some prefatory remarks which deserve comment.[4]

If the references to Dr. Thompson's personality, persistence, intensity and seeming ruthlessness in pursuing her lawsuit were meant to establish that the verdict was the product of passion and prejudice, we cannot agree. How

---

[4] "Dr. Thompson became convinced that the defendant doctors and hospital personnel were committing the tort of intentional interference with her pediatric practice and in consequence started this lawsuit.

"As a caveat, it is apparent that the serving of Summons and Complaint on the many defendants was not regarded by the defendants and their families and friends as demonstrating esteem and affection. Likewise the deposing of most of the 42 witnesses could not be calculated to induce community or personal harmony. It would be an understatement to say that Dr. Thompson, a strong personality, was controversial. However sincere and intense Dr. Thompson may have been in her suspicions and beliefs about the activities of the defendants, all of the parties were in court in an expensive 14-day lawsuit because Plaintiff undertook this legal action. The defendants were not in court by their own choice.

"The intensity of Plaintiff's approach was reflected by her subpoenaing defendant doctors to be in court every day of a lengthy trial without regard for their patients or practice. *Relief from the burden of this subpoena was granted by the court out of the presence of the jury.*

". . .

"In a nutshell, the plaintiff's problem throughout this lawsuit has been to find evidence or actionable words or acts, to substantiate her deeply held suspicions and accusations. It would appear to the court that Dr. Thompson was sincere, intense, and accusatory. Being sincere, intense, and accusatory is not a substitute for evidence. . . .

". . .

"It would appear to this court that the jury verdict against the hospital was based on passion, prejudice, intensity, and the accusatory activity of Plaintiff; . . ." (Italics ours.)

much of Dr. Thompson's antagonism was communicated to the jury we cannot say—not having been directed to any matters either in or dehors the record. However, Dr. Thompson's fervor, tenacity and even her rancor toward the defendants do not qualify as:

> either untoward or inflammatory or hyperdramatic events of such cogency and force as to be unamenable to curative instructions or admonitions, or of a kind and nature which, from their very occurrence, must be said as a matter of law to produce passion and prejudice because of their undeniable impact to induce the jury to violate its oath to deliver a true verdict upon the evidence alone.

*James v. Robeck,* 79 Wn.2d 864, 866, 490 P.2d 878 (1971).

Nor was it proper for the trial judge to weigh the evidence of Dr. Thompson's professional idiosyncrasies offered by the defendants in support of their defenses of truth and privilege.[5] Again, such matters, together with witness credibility, are exclusively within the jury's province.

In the final analysis, while we might harbor some of the same feelings of unease about the evidence and this verdict, the parties had their day in court, the judge permitted the evidence to be presented to the jury for its consideration and the jury was given the law of the case. The jury responded in good conscience; the system has worked as it was designed to work, although perhaps not in the way we or the trial judge would have it. That same system, except for certain well defined exceptions which we have found are not present here, now precludes our disturbing the jury's work product.

---

[5] "[T]he defendants presented substantial evidence indicating that the conduct of the defendants toward the plaintiff was routine, and in fact in some instances especially careful and restrained; that the plaintiff had characteristics that caused some patients to like her and others to dislike her. There was evidence of practices and procedures employed by Dr. Thompson that were somewhat different from the usual concept in such matters, i.e., (1) an aversion to the use of cows' milk for children; (2) that she delivered a baby in her office under less than desirable circumstances; (3) that she referred to another doctor in unflattering language, i.e., 'a butcher;' (4) that she was difficult in her behavior to hospital employees; and (5) that she exhibited displays of temper."

The trial court's order granting judgment n.o.v. and a new trial must be reversed, and the jury's verdict reinstated. It is so ordered.

WORSWICK, A.C.J., and PETRIE, J., concur.