COURT OF APPEALS DIV 1
2013 OCT 28 AM 9: 20


## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

RAYMOND GROVE, )
)  DIVISION ONE
    Appellant, )
)  No. 69556-8-I
    v. )
)
PEACEHEALTH ST. JOSEPH )
HOSPITAL, )  PUBLISHED OPINION
)
    Respondent. )
)
ST. JOSEPH HOSPITAL )
FOUNDATION, DR. SARA MOSTAD )
and DR. DAG JENSEN, )
)
    Defendants. )  FILED: October 28, 2013
    )

DWYER, J. — In the state of Washington, medical malpractice is a statutory cause of action, which requires that the plaintiff prove the standard of care to be exercised by a health care provider within the profession or class to which he or she belongs. This is no less the case when a hospital opts to provide medical care to its patients by using a "team approach." Here, Raymond Grove filed a lawsuit against PeaceHealth St. Joseph Medical Center (PeaceHealth), alleging medical malpractice for failure to timely diagnose compartment syndrome in his left leg. Grove sought damages against PeaceHealth under a theory of vicarious liability for negligence committed by its medical team or, alternatively, by Dr. Richard Leone as the leader of the team. The jury found in Grove's favor and

awarded Grove $583,000 in damages. The trial court overturned the verdict on a motion for judgment as a matter of law, finding that no legal basis existed for holding PeaceHealth vicariously liable, given that Grove had not proved that any specific employee had acted negligently. Because Grove failed to prove the applicable standard of care as required by statute, we affirm.

I

On December 21, 2006, Grove underwent aortic root and valve replacement surgery at PeaceHealth in Bellingham. After the surgery was successfully completed, Grove was placed in the intensive care unit, as is standard hospital practice following heart surgery. Dr. Leone, Grove's attending physician during the surgery, acted as primary physician until December 25. On that date, Dr. Leone traveled to New Jersey for Christmas, and Dr. Edward Zech, the surgeon on call, assumed the role of primary physician. Similarly, Dr. James Douglas assumed the role of primary physician from Dr. Zech on December 29. Dr. Leone remained the surgeon of record until Grove was released from the hospital.

Grove developed a number of complications after his surgery. Significantly, he was having trouble breathing, and was thus intubated from December 23 through December 26, during which time he was sedated.[1] Grove also developed pneumonia and bacteria in his blood, for which Dr. Sara Mostad, an infectious disease specialist, was called in. Dr. Zech was especially

---

[1] Intubated patients, despite being under sedation, are awakened periodically and are typically able to communicate.

concerned about the possibility of infection, because an infection in Grove's heart would have almost certainly been fatal. On December 29, Shane Spears, a physician assistant (PA), noted that Grove's left calf was exhibiting "edematous, tenderness to palpitation, warm with erythema on the anterior aspect.[2] Two to five centimeters larger than the right." PA Spears also noted that Grove had "weakness in flexion"[3] in both ankles, "but it was worse on the left." Dr. Douglas and Dr. Mostad suspected, based on these symptoms, that Grove may have had cellulitis, a bacterial infection typically treated with antibiotics. Grove was already on antibiotics at the time these symptoms developed. Grove's condition appeared to improve on December 30, but by December 31, Grove's symptoms had spread down to his foot.

On December 31, Dr. Mostad noticed that Grove was unable to fully dorsiflex[4] his foot and that he was dragging his left toe when he walked. Dr. Mostad suspected at that time that Grove had compartment syndrome. Dr. James Miller[5] conducted a compartment pressure test and found that the pressure in Grove's left leg was over three times the normal average, indicating that Grove was suffering from compartment syndrome. Compartment syndrome is a known, albeit rare, complication from a long surgery, such as the heart surgery Grove underwent.[6] Symptoms of compartment syndrome typically

---

[2] In laymen's terms: swelling, pain to the touch, and redness on the front of the leg.
[3] Ability to bend a joint.
[4] Bend towards the shin.
[5] Dr. Miller was not implicated in this lawsuit, as he was not alleged to have been part of the "team."
[6] Grove's surgery lasted upwards of six hours.

include hardness, swelling, numbness, tingling, pallor, loss of neurological function, lack of pulse, and excruciating pain. As far as the witnesses could recall or as Grove's medical records indicated, at no time did Grove ever complain of excruciating pain, the most notable symptom of compartment syndrome. If detected early, compartment syndrome is "completely reversible"; if not, the damage is irreversible and can be so severe as to necessitate limb loss. Grove underwent surgery to relieve his compartment syndrome but, by that time, his compartment syndrome had advanced to the point of necrosis,[7] resulting in permanent injury to his left leg.[8]

A jury trial began on June 13, 2012. Witnesses for both parties testified that Grove was treated and attended to using a "team" approach. Dr. Douglas explained how the "team" approach operated, stating that the "team," consisting of "the surgeons and the physician assistants," made rounds together twice per day. He further stated, "In our situation our patients are seen by both surgeons or all three surgeons depending on the circumstance regardless of who is primarily in charge. So at any time a patient needs assistance that physician is well-aware of what's going on. So we basically assume everybody is our patient." Dr. Douglas testified that the "team" "evaluate[s] patients in such a way that everybody gets a chance to have input."

Dr. Leone testified that the "team" made rounds more than once a day and that the "team" may also include students, nurses, and other "ancillary staff." Dr.

---

[7] Muscle death.

[8] During the surgery, it was also discovered that Grove did not have cellulitis.

Zech testified that the method of treatment used was "very much a team approach," designed to keep all staff informed. Dr. Zech further testified that the team consisted of surgeons, physician assistants, and intensivists. PA Spears testified that the physicians might not do a physical examination of the patient during rounds, instead relying on the physician assistant's findings, if there was not a concern with the patient. However, PA Spears also testified that he always discussed the plan of care with the surgeons before he implemented it.

Dr. Sean Ghidella, an orthopedic surgeon and expert witness for Grove, testified that the care of Grove fell below the standard of care because of a lack of proper monitoring and a failure to rule out a known possible complication after surgery.[9] When asked who he was criticizing, Dr. Ghidella testified as follows:

A: I identified Dr. Leone.
Q: And why did you identify Dr. Leone as opposed to someone else?
A: I was aware that there were multiple providers involved, that there was a team approach. At the time I was asked, I was not certain entirely as to who was to blame, but I do know that one person that at least shared in the responsibility would be the surgeon of record. He is ultimately responsible for that admission and the patient's care under that admission.
Q: So based on –
A: So for the lack of anyone else with certainty, I knew that at least I could include him in that discussion, but I don't know that I committed anyone else for the lack of clarity in terms of what was going on in the complexity of the situation, the type of documentation that I had available to try to define who said what when and who did what when.
Q: Your understanding is that this was a team approach that was dealing with Mr. Grove?
A: Yes.
Q: As far as you're concerned, who would be responsible for the

---

[9] Dr. Ghidella was deposed in anticipation of his unavailability for trial; the transcript of his deposition was read to the jury.

team at any particular time?
A: I know in my patients, I do. I feel responsible. I imagine he would, too. I understand that's probably how the law sees it.
. . .
Since my discovery deposition, I have clarified this was a team approach, and Dr. Leone wasn't necessarily in charge of this patient at the time that the diagnosis was made.
Q: But in terms of your opinion, he was ultimately responsible as being the doctor in charge at the outset?
A: That would be correct, yes, sir.

Dr. Ghidella testified that "unrecognized compartment syndrome" was below the standard of care because "[w]ith proper monitoring, this should have been an earlier recognized complication." Proper monitoring, according to Dr. Ghidella, would have consisted of interviewing Grove when he was alert and squeezing his leg to test for firmness, with increased physical monitoring while Grove was intubated. Dr. Ghidella would have recommended that Grove's leg be examined on every round. Dr. Ghidella testified that he was "not sure that any [monitoring] was done during critical parts of [Grove's] management, or at least appropriate monitoring." It was Dr. Ghidella's opinion, to a reasonable degree of medical certainty, that Grove would have had "no permanent deficits or at least a better outcome" had the standard of care been met. Dr. Ghidella was also of the belief that had the standard of care been met, he could have determined when Grove's compartment syndrome developed. Dr. Ghidella testified that the damage sustained by Grove was "clearly" a result of the late diagnosis.

Dr. Carl Adams, a cardiovascular surgeon and Grove's other expert witness, testified that he was familiar with "the standard of care for every cardiovascular surgeon practicing across the United States." Dr. Adams testified

that it was his expert opinion that "the cardiovascular surgeon who is in charge of the patient's care failed to meet the standard of care that one would expect." Dr. Adams also testified that Dr. Leone was responsible for the "team," as team members report to the team leader. When asked, "So if the PAs make a mistake, it's the head of the ship's mistake?" Dr. Adams answered, "Correct."

Dr. Adams testified that the standard of care was breached because "knowing that this patient had a very complex surgical procedure," the "team" should have checked for compartment syndrome, as it is a known complication of a long surgery. In Dr. Adams's opinion, it was "below the standard of care not to have diagnosed" compartment syndrome based on Grove's symptoms of "erythema,"[10] "edema,"[11] and "induration,"[12] while he was on antibiotics.[13] Dr. Adams also cited a lack of communication as a breach of the standard of care. Dr. Adams further testified that the failure to properly monitor for compartment syndrome began with Dr. Leone "and just continued." Had the "team" not breached of the standard of care, in Dr. Adams's opinion to a reasonable degree of medical certainty, Grove would have had a better chance of suffering no injury or a less severe injury to his leg.

When questioning both experts about the standard of care, counsel for Grove framed the inquiry as follows: Have you developed an opinion to a

---

[10] Redness.

[11] Swelling.

[12] Hardening.

[13] Dr. Adams testified that while these are symptoms of cellulitis, antibiotics treat cellulitis, and these symptoms should not have continued to appear while Grove was on antibiotics had cellulitis been the problem.

reasonable degree of medical certainty, "concerning whether or not the medical treatment provided to Raymond Grove met the standard of care in the state of Washington for patients under the same or similar circumstances . . . ?" PeaceHealth did not object to the form of the question on any occasion.

The trial court instructed the jury with regard to the standard of care and vicarious liability as follows:

> A physician, surgeon or health care provider owes to the patient a duty to comply with the standard of care for one of the profession or class to which he or she belongs.
>
> A physician, surgeon or health care provider has a duty to exercise the degree of skill, care, and learning expected of a reasonably prudent physician, surgeon or health care provider in the state of Washington acting in the same or similar circumstances at the time of the care or treatment in question.
>
> Failure to exercise such skill, care, and learning constitutes a breach of the standard of care and is negligence.

Jury Instruction 3.

> The defendant PeaceHealth is a non-profit corporation. A corporation can act only through its officers, employees, and agents, including the employed physicians and physicians' assistants in this case. Any act or omission of an employee is the act or omission of the hospital corporation.
>
> A hospital's employees must exercise the degree of skill, care, and learning expected of reasonably prudent employees of hospitals in the State of Washington acting in the same or similar circumstances at the time of the care or treatment in question. Failure to exercise such skill, care, and learning is negligence.

Jury Instruction 5.

The jury returned a special verdict in favor of Grove, finding that PeaceHealth was negligent and that such negligence was a proximate cause of

Grove's injury.[14] The jury awarded damages in the amount of $583,000.

Thereafter, PeaceHealth moved for judgment as a matter of law. The trial court

granted PeaceHealth's motion, ruling that "there was no evidence sufficient to

support the verdict under CR 59(b)."[15] In so ruling, the trial court stated:

> This court is of the opinion that the law in this state requires
> proof of an independent health care provider's failure with some
> exceptions. . . . A hospital which operates with team treatment
> provided only by hospital employees, which is what we have here
> pretty much, and the hospital is the only defendant, so where a
> hospital operates with team treatment provided only by the hospital
> employees will always be liable under respondeat superior where
> an employee is negligent within the scope of their employment. *But*
> *a plaintiff is still required to prove negligence on the part of the*
> *particular employee. Were that not the case, then every bad*
> *outcome in a team setting would result in liability.*

(Emphasis added.) The trial court explained that a team is not negligent, but

rather that "[t]here has to be a negligent player on the team." The trial court

concluded:

> [T]herefore somebody must, for the plaintiff to prevail, be charged
> with the responsibility of monitoring close enough that it can be
> identified, i.e., through the twice-a-day pressure testing, or 24/7
> monitoring, whatever your theory is. But to prevail on either of those
> theories that has to be the standard of care and there wasn't
> evidence of that.

Grove appeals from the trial court's ruling.

---

[14] QUESTION 1: Was the defendant negligent?
ANSWER: Yes.
QUESTION 2: Was the negligence a proximate cause of injury to the plaintiff Mr.
Grove?
ANSWER: Yes.
[15] CR 59(a) states: "On the motion of the party aggrieved, a verdict may be
vacated . . . . Such motion may be granted for any one of the following causes materially
affecting the substantial rights of such parties: . . . (7) That there is no evidence or reasonable
inference from the evidence to justify the verdict or the decision, or that it is contrary to law." CR
59(b) delineates the procedure for filing such a motion.

II

Grove asserts that he presented evidence sufficient to prove that the "team" which treated him was negligent and, therefore, that the jury's verdict should be reinstated. This is so, he asserts, because it is unnecessary to implicate a particular individual when the team as a whole did not adhere to the standard of care. We disagree. Grove did not prove the relevant standard of care.

This court reviews de novo a decision to grant or deny a motion for judgment notwithstanding the verdict. Schmidt v. Coogan, 162 Wn.2d 488, 491, 173 P.3d 273 (2007); Winkler v. Giddings, 146 Wn. App. 387, 394, 190 P.3d 117 (2008). Motions for judgment notwithstanding the verdict were renamed "'motions for judgment as a matter of law'" in 1993. Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting Litho Color, Inc. v. Pac. Emp'rs. Ins. Co., 98 Wn. App. 286, 298 n. 1, 991 P.2d 638 (1999)). Granting judgment as a matter of law is not appropriate where substantial evidence exists to sustain a verdict for the nonmoving party. Schmidt, 162 Wn.2d at 491 (citing Hizey v. Carpenter, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992)); see also Indus. Indem. Co. of the Nw., Inc. v. Kallevig, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990). Indeed, "[a]n order granting judgment as a matter of law should be limited to circumstances in which there is no doubt as to the proper verdict." Schmidt, 162 Wn.2d at 493. Hence, a directed verdict should be granted only where no evidence or reasonable inferences from the evidence could support a

verdict for the nonmoving party. Winkler, 146 Wn. App. at 394 (citing Bertsch v. Brewer, 97 Wn.2d 83, 90, 640 P.2d 711 (1982)).

PeaceHealth is liable, if at all, under the doctrine of vicarious liability. Vicarious liability is liability for the negligence of an actor under the defendant's control. Van Hook v. Anderson, 64 Wn. App. 353, 363, 824 P.2d 509 (1992). An employer cannot be vicariously liable if its employees are not negligent. Doremus v. Root, 23 Wash. 710, 716, 63 P. 572 (1901); Orwick v. Fox, 65 Wn. App. 71, 88, 828 P.2d 12 (1992). The parties do not dispute that all members of the "team" were employees of PeaceHealth and that PeaceHealth is liable for the negligent acts of the members of the "team." At issue is whether, based on the evidence presented, PeaceHealth can be held vicariously liable for the negligence of the "team" as a unit or whether Grove needed to implicate a specific individual.

In Washington, medical malpractice is a statutory cause of action. Ch. 7.70 RCW. A plaintiff who alleges malpractice on the part of a health care professional must prove that

> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;

> (2) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040. The plaintiff must prove the relevant standard of care through the presentation of expert testimony, unless a limited exception applies.[16] Harris v. Robert C. Groth, M.D., Inc., P.S., 99 Wn.2d 438, 449, 663 P.2d 113 (1983) (citing Douglas v. Bussabarger, 73 Wn.2d 476, 479, 438 P.2d 829 (1968)). None of the limited exceptions apply in this case.

RCW 7.70.040(1) can be parsed into six elements that the plaintiff must prove in order to prevail on a claim of medical malpractice: (1) "The health care provider" (2) "failed to exercise" (3) "that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time" (4) "in the profession or class to which he or she belongs," (5) "in the state of Washington," (6) "acting in the same or similar circumstances." The problem with Grove's "team" theory is that it fails to include elements (1) and (4).

By not implicating a particular individual, Grove failed to prove the standard of care for the relevant "health care provider." Grove's experts did not state as to whom the standard of care applied, as they framed their testimony in terms of the standard of care that a *patient* should *receive* and not the standard of care that a *health care professional* should *provide*. A team is not in and of

---

[16] One such exception is the doctrine of res ipsa loquitor.
Res ipsa loquitur applies when
> "(1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff."

Ripley v. Lanzer, 152 Wn. App. 296, 307, 215 P.3d 1020 (2009) (quoting Pacheco v. Ames, 149 Wn.2d 431, 436, 69 P.3d 324 (2003)). Grove does not allege that permanent damage resulting from compartment syndrome does not ordinarily happen in the absence of negligence. In fact, Grove concedes that compartment syndrome is a known complication from a long surgery. Accordingly, res ipsa loquitor is inapplicable here.

itself a health care provider. Rather, a team is a compilation of its members; in this case, a compilation of health care providers. Chapter 7.70 RCW does not contemplate liability for groups of providers. See RCW 7.70.040 ("*The* health care provider . . ." (emphasis added)).

Moreover, the "team" cannot belong to a profession or class. It is unclear in this case who exactly was on the "team." Indisputably the "team" included the three surgeons and the PAs. Some witnesses expanded the "team" much further to include medical school students, nurses, intensivists, and "ancillary staff." Clearly these positions do not all belong to the same "profession or class."[17] Grove contends that it would not make sense for the standard of care to change depending on who was treating him. To the contrary, this makes perfect sense. Surgeons, PAs, and nurses cannot all be expected to adhere to the same duty, given that they belong to different professions with different levels of required skill and training. Because the members of the "team" belonged to different professions and classes, the "team" collectively could not have belonged to a single class. Thus, because Grove did not prove elements (1) and (4) of RCW 7.70.040(1), the jury verdict was supported by neither the evidence nor the law.

Grove's "team" theory rests on the notion that causation and damages are enough to prove malpractice. In fact, Grove contends that duty is irrelevant to his

---

[17] For instance, Dr. Zech testified that his training consisted of medical school, two residencies, and additional training in both general and cardiothoracic surgery, whereas PA Spears testified that his training consisted of nursing school and a master's degree program in physician assistant studies.

claim.[18] Medical malpractice actions, like all tort actions, require that the plaintiff prove duty, breach, causation, and damages. Harbeson v. Parke-Davis, Inc., 98 Wn.2d 460, 467-68, 656 P.2d 483 (1983). It is a basic principle of tort law that, if any of these four elements are not proved, there can be no liability. See Harbeson, 98 Wn.2d at 467-68. Grove's claim is lacking both duty and causation. Without delineating the standard of care applicable to a particular health care provider or defining the relevant profession or class, Grove failed to prove that a duty existed or to whom any such duty belonged. Duty, especially in the field of medical practice, does not just exist in the ether. Even if Grove's articulation of the standard of care covered some members of the "team," the surgeons for example, Grove did not present evidence that but for any one of those particular individuals' failure to adhere to the standard of care, he would not have been injured. Accordingly, Grove failed to prove proximate cause.[19] Without the elements of duty and proximate cause, Grove's claim fails.

The experienced trial judge detected this shortcoming when he overturned the jury's verdict. Although the evidence is this case was multitudinous and confusing such that it could and did mislead the jury, the trial judge discerned that Grove failed to prove a standard of care relevant to "a health care provider" belonging to a particular "profession or class." In his ruling, the trial judge

---

[18] "[I]t is irrelevant in this case which individual on the team would have had the obligation to perform standard-of-care monitoring." Appellant's Br. at 12.

[19] "Proximate cause must be established by, first, a showing that the breach of duty was a cause in fact of the injury, and, second, a showing that as a matter of law liability should attach." Harbeson, 98 Wn.2d at 475-76 (citing King v. City of Seattle, 84 Wn.2d 239, 249, 525 P.2d 228 (1974)).

explained that "a team isn't negligent," and instead there needed "to be a negligent player on the team." As he explained,

> [I]t is the plaintiff's burden to specify which *health care provider* failed to adequately monitor, identifying *that person* in pretrial discovery and producing testimony from a qualified expert that such failure was not within the standard of care expected *of such provider* within the state of Washington.

(Emphasis added.) As appealing as Grove's "team" theory may have been, the trial judge astutely observed that changes in the approach to health care do not automatically change the law.

Nevertheless, Grove contends that Thompson v. Grays Harbor Cmty. Hosp., 36 Wn. App. 300, 675 P.2d 239 (1983), and Hansch v. Hackett, 190 Wash. 97, 66 P.2d 1129 (1937), support his assertion that a hospital can be found liable when an unidentified member of a "team" acts negligently. We disagree.

In Thompson, the plaintiff, Dr. Thompson,[20] sued Grays Harbor Community Hospital under a theory of vicarious liability for tortious interference with her medical practice. Thompson, 36 Wn. App. at 301. Thompson introduced evidence that staff at Grays Harbor lied about Dr. Thompsons' availability to parents who requested her, "made disparaging remarks about her," and encouraged parents "to have their children treated by the house physician instead of by Dr. Thompson." Thompson, 36 Wn. App. at 303. Although all of the employees Dr. Thompson named in her complaint were exonerated, the court held that Grays Harbor was still vicariously liable, as Dr. Thompson proved that

---

[20] Dr. Thompson was a pediatrician. Thompson, 36 Wn. App. at 302.

other, unnamed hospital employees had tortiously interfered with her medical practice. Thompson, 36 Wn. App. at 305-06.

Thompson differs from this case in that Thompson's cause of action was not statutory, nor did it sound in medical malpractice. Tortious interference is a common law claim. Duty in such a claim is not related to any particular profession or class, and is instead based upon the defendant's knowledge of the plaintiff's relationships. Thompson, 36 Wn. App. at 303 (setting forth the elements of a prima facie case of tortious interference). Moreover, in a tortious interference case, no expert testimony is necessary to establish duty. Here, however, Grove was required to prove duty for the relevant "profession or class" of "health care provider" through expert testimony. RCW 7.70.040 does not contemplate a general overarching duty applicable to anyone who may have come into contact with the patient. Thus, Thompson is inapplicable to this case.

Hansch, though factually similar to this case, is also inapplicable. In Hansch, the plaintiff, Mr. Hansch, brought suit against Dr. Hackett and the Columbia Clinic for a failure to diagnose eclampsia contravis. 190 Wash. at 97-98, 101. Mrs. Hansch, the plaintiff's wife, was alternatively under the care of Dr. Hackett, Dr. Clark, and two nurses, at various times during the hours before her untimely death. Hansch, 190 Wash. at 99-100. The jury returned a verdict finding only the Columbia Clinic liable. Hansch, 190 Wash. at 97-98. The Supreme Court held that although Dr. Hackett was not found negligent, the jury could have found that Dr. Clark or either of the two nurses were negligent; thus, the Columbia Clinic could be held liable under the doctrine of respondeat

- 16 -

superior. Hansch, 190 Wash. at 101-02. Hansch, however, was decided in 1937, before the legislature passed RCW 7.70.040.[21] At that time, medical malpractice was a common law claim and no statutory requirement existed necessitating expert testimony in order to establish the standard of care applicable to "a health care provider" as a member of a particular "profession or class." Hansch no longer properly states the law.

Grove failed to prove the standard of care in this case, as he did not implicate a "health care provider" nor identify the relevant "profession or class" to which a particular duty was applicable. Grove thus failed to prove the standard of care as required by RCW 7.70.040. The trial court properly so ruled.

III

Grove further contends that the trial court erred by overturning the jury verdict, claiming that he sufficiently proved that a particular individual's negligence was the proximate cause of his injury. This is so, he asserts, because Dr. Leone was negligent in his role as the "leader" of the "team."[22] We disagree.

_____

[21] RCW 7.70.040 was enacted in 1976.

[22] An individual may be held liable as the "leader" of a "team" pursuant to the "captain of the ship" doctrine. Under the "captain of the ship" doctrine, a patient who is negligently injured during surgery may bring an action against the lead surgeon for the actions of other individuals acting at the surgeon's direction, regardless of their actual employment status. Van Hook, 64 Wn. App. at 364. However, this case does not involve the "captain of the ship" doctrine. Grove does not contend that his injury was caused by negligent conduct committed during surgery. Rather, Grove contends that the negligent conduct was committed during postsurgical monitoring. However, Dr. Leone was not exercising control and directing the actions of the staff during the entire postsurgery period. In fact, Dr. Leone was in New Jersey to celebrate Christmas during half of the relevant time period. The "captain of the ship" doctrine, therefore, does not support Grove's claim.

Grove does not point to Dr. Leone's direct actions as the proximate cause of his injuries, especially as neither of Grove's experts could identify when the compartment syndrome developed. Rather, Grove contends that Dr. Leone was negligent in his role as the "leader" of the "team." Thus, in order to support a finding that Dr. Leone was negligent, Grove needed to demonstrate either that Dr. Leone negligently supervised the "team" or that the standard of care was that the team leader had a duty to instruct all of the staff to monitor for compartment syndrome. Grove does not allege that Dr. Leone was negligent in his supervision, nor can he, as Dr. Leone could not have supervised from the other side of the country. Further, neither of Grove's experts testified as to whether Dr. Leone should have left instructions before he left for New Jersey. To the contrary, Dr. Adams testified that Dr. Leone's responsibility ended when he turned over care of Grove to Dr. Zech.[23] For his part, Dr. Ghidella testified that Dr. Leone remained responsible for the entire period until December 31, but his conclusion was based on the fact that Dr. Leone was the physician of record, not on a relevant standard of care. Thus, the evidence presented was insufficient to prove that Dr. Leone was negligent in his duties.

Grove's assertion that Dr. Leone was liable as the "leader" of the "team" is merely an attempt to hold Dr. Leone vicariously liable for the actions of the other doctors and staff that treated Grove. Supervisors cannot be vicariously liable for the negligence of the employees whom they supervise. Harvey v. Snohomish

---

[23] "Q: In terms of your statement as to the relative liability, is it the head of the team that you're critiquing or each individual member? A: . . . [T]hen if the head team member is gone, then it's the person who he designates the new captain."

County, 124 Wn. App. 806, 820, 103 P.3d 836 (2004), rev'd on other grounds, 157 Wn.2d 33, 134 P.3d 216 (2006); see also Van Hook, 64 Wn. App. at 365 (no vicarious liability of surgeon for nurses who assisted him, when surgeon did not control how nurses counted sponges).  Dr. Leone was the supervisor, not the employer, of the "team."  Unless Grove could show that Dr. Leone was independently liable, he cannot point to Dr. Leone as a specific individual for whom PeaceHealth may be held vicariously liable.  This Grove has failed to do.  Accordingly, PeaceHealth cannot be held liable for Dr. Leone's asserted liability resulting from his role as "leader" of the "team."

Affirmed.

We concur: