IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36531-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSHUA JAMES PULLIAM, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Joshua Pulliam challenges on appeal the juvenile court's

declination of jurisdiction. He later, in adult court, pled guilty to two counts of rape, two

counts of assault, and one count of harassment. Because the juvenile court entered

thorough and comprehensive findings of fact supported by evidence and because the

juvenile court considered all relevant factors when declining jurisdiction, we affirm the

declination and Pulliam's convictions.

FACTS

We briefly describe the crimes committed by Joshua Pulliam, before outlining the

extensive facts of Pulliam's background reviewed by the juvenile court when declining jurisdiction. Pulliam's convictions stem from three incidents in 2017. At different times, Pulliam attacked three women, who were strangers to him, in public places. On March 8, 2017, Pulliam approached a woman and requested a kiss. He then proceeded to brutally attack and rape her. On May 19, 2017, Pulliam attempted to rape another woman, but a passerby intervened and Pulliam fled. Finally, on November 23, 2017, Pulliam approached another woman, asked for a cigarette, and then attacked and raped her.

During the latter two attacks, Joshua Pulliam was on active supervision by the juvenile court. Joshua Pulliam, born October 31, 2001, committed the charged crimes between the ages of fifteen and sixteen years old.

## PROCEDURE

The State of Washington originally charged Joshua Pulliam, in juvenile court, with one count of first degree rape and one count of second degree assault for the March 8, 2017 incident, one count of attempted second degree rape for the May 19, 2017 incident, and one count of second degree rape and one count of second-degree assault for the November 23, 2017 incident. The State thereafter requested that the juvenile court decline jurisdiction and transfer the case to adult court. Pursuant to the State's request, the juvenile court conducted a lengthy hearing to determine whether to decline jurisdiction.

The parties elicited the following evidence during the declination hearing. Joshua

2

Pulliam was diagnosed with attention-deficit hyperactivity disorder (ADHD) at an early age. Pulliam also suffers from absence seizures, although he has never been diagnosed with a seizure disorder. Absence seizures involve lapses in attention. In school, Pulliam partook in an individualized education plan (IEP) and progressed poorly academically. Pulliam also suffers from a speech impediment and an unspecified anxiety disorder.

Joshua Pulliam had earlier experiences in juvenile court. On March 15, 2017, he completed a diversion program for malicious mischief in the third-degree. On April 13, 2017, the juvenile court placed him on probation for fourth-degree assault and malicious mischief in the third-degree. On September 13, 2017, the juvenile court extended probation for attempted third-degree malicious mischief.

Joshua Pulliam treats his ADHD with Ritalin, Strattera, and Concerta. According to Pulliam and his mother, Pulliam uses phenobarbital to manage his seizures. The Yakima County juvenile detention center did not list, however, phenobarbital as one of Pulliam's current medications. The detention center record listed, as Pulliam's medications, sertraline for depression, oxcarbazine for seizures, guanfacine for ADHD, clonidine for anxiety, aripiprazole for major conduct disorder, and an albuterol inhaler for asthma.

Linda Pulliam, Joshua Pulliam's mother, testified about her son's medical issues. She helped Joshua administer his medications, and she averred that he took phenobarbital consistently before his arrest.

3

During the decline hearing, defense counsel asked Yakima County's juvenile detention manager, Steve Driscoll, when the detention facility removed Joshua Pulliam from his long-term seizure medication, phenobarbital. Driscoll responded:

> Never knew he was on it. There were indications that he was on medication. Our nursing staff had called doctors and whoever was purported to be prescribing medication, and they stated he had been off of it for years and that they were uncomfortable in re-prescribing the medication for him.

Report of Proceedings (RP) at 366. Driscoll commented that Pulliam had not taken phenobarbital for many years.

At the decline hearing, both parties presented expert testimony. Forensic psychotherapist Michael Comte assessed Joshua Pulliam and testified on Pulliam's behalf. Comte opined that preservation of juvenile court jurisdiction would serve Pulliam's best interests. Psychologist Hans Michielsen testified on behalf of the State and opined that declination would serve the public's and Pulliam's interests. Other experts testified to the condition of and treatment needed by Pulliam.

Michael Comte opined that Joshua Pulliam had an I.Q. score between seventy-five to eighty-five points. Pulliam read and wrote at a first-grade level and could perform mathematical computations at a fourth-grade level. He likened Pulliam's emotional maturity to an eleven- to thirteen-year-old. Pulliam acted impulsively and lacked insight. Comte noted that Pulliam responded aggressively toward other children while in kindergarten. He further noted that Pulliam responded well to treatment throughout life,

4

until reaching puberty, at which time his symptoms intensified.

Paula Fluegge, Joshua Pulliam's probation counselor, testified that, beginning in 2017, Pulliam participated in WISe, a social services program. Pulliam enrolled in WISe in the late summer of 2017, and he had an anticipated graduating in November 2017. Pulliam did not graduate, however, due to his arrest for the crimes charged in this prosecution. Psychologist Hans Michielsen testified that Pulliam made little to no progress in WISe. According to Michielsen, programs like WISe, unlike IEPs, "don't set very clear and specific goals that are measurable and observable." RP at 42.

According to Paula Fluegge, Joshua Pulliam violated his probation twice. Pulliam failed to stay at his home and refused to abide by Linda Pulliam's rules. Pulliam's mother also found drugs in his bedroom.

Paula Fluegge described Pulliam's fragmented conversation style as "talking to you about one thing and then all of a sudden, he'd be over on another tangent, you know, talking about something else." RP at 219. According to Fluegge, Pulliam "just marches to a different drum than what other kids do." RP at 232. Further, Pulliam often disclosed information that went against his best interests. In one instance, Pulliam informed Fluegge about illegally catching a large fish, which he traded for a sizeable amount of marijuana, which drugs he then sold for $250. RP 233.

While using juvenile assessment tools, Paula Fluegge determined Joshua Pulliam to be a moderate risk youth, but his risk level went "up higher since he re-offended

5

again." RP at 230. Nonetheless, she opined that Pulliam was amenable to treatment, because he completed random drug tests and attended scheduled sessions in his diversion programs.

Juvenile probation officer Dan Behler testified to Joshua Pulliam's detention history. Behler described an instance when, on December 15, 2017, Pulliam spoke, while in detention, with his grandmother over the phone. Pulliam told his grandmother that another juvenile hit him in the nose and that he planned "to beat the shit out of" the person who hit him. RP at 321. Pulliam subsequently told his grandmother that he would likely lose his phone privileges. Soon after, Pulliam attacked another juvenile with a headlock, dragged the juvenile to the ground, and punched him several times before an officer intervened.

Dan Behler testified that the department of corrections (DOC) recommended "remanding Joshua Pulliam to adult jurisdiction." RP at 311-12. Behler explained how Pulliam's actions factored into this recommendation:

> One, there is a sense of surprise, okay; in reference to the—Joshua Pulliam going towards a head and/or throat area in each situation; in reference to the victims in the police matters: overpowering them, striking them, being very aggressive with them; what led up to it, the planning, whether it be instant planning or time to plan. It's—there is the commonality amongst all of them in reference to the sense of surprise and how he approached or attacked or charged – however, you want to phrase it—the victims.

RP at 320.

6

Linda Pulliam testified that, before Joshua Pulliam attacked a fellow juvenile, he stopped taking his phenobarbital to control his seizures. She noted that his behavior changed after being taken off of the medication, after which "he was getting in trouble right and left for everything." RP at 374. Before Pulliam's hearing, Michael Comte did not know that Pulliam no longer took phenobarbital and opined that the ending of the drug was problematic.

John Scott, a sex offender treatment coordinator for juvenile detention facility Green Hill Academy, testified regarding Joshua Pulliam's treatment options as either a juvenile or an adult defendant. Scott explained that youthful offenders convicted as adults serve DOC time in a Juvenile Rehabilitation Administration (JRA) facility, such as Green Hill. Scott stated that youthful offenders generally stay at Green Hill until they reach age twenty-one, but may be transferred to the DOC sooner if the offender exhibits behavioral problems. By contrast, youth still under juvenile jurisdiction serve their entire sentence at Green Hill and may not be sent to DOC. Youth sentenced as juveniles that engage in aggressive behavior, however, may be transferred to the intensive management unit, which would hinder the youth's treatment.

John Scott described the treatment process for youths sentenced by juvenile court. The youths receive individual counseling, cognitive behavioral therapy, and didactic behavioral therapy. The courses run in 16-week cycles. Once the youths serve their time, they are transferred to a group home, which is structured, but less structured than

7

the detention facility. While in the group home, youths may continue school or obtain a

job. The youths later return home on parole.

John Scott testified that a juvenile sentenced in adult court would experience

essentially the same treatment as one sentenced by the juvenile court, at least up to age

twenty-one, at which time juvenile court offenders are transferred to DOC rather than to a

group home and later parole. Up to the age of twenty-one, however, the adult court

offender's experience "would be no different than a JRA-convicted youth['s]," aside

from the possibility of being sent to the DOC earlier for behavioral problems. RP at 258.

DOC treatment coordinator Cathi Harris testified that DOC evaluates a juvenile

sentenced as an adult for a sexual conviction to assess their treatment amenability. Harris

explained that youthful offenders are ineligible for sex-offender treatment until twelve to

twenty-four months before their release date.

Dr. Erin Gorter-Hines did not testify at Joshua Pulliam's hearing, but rather

submitted a report of a comprehensive evaluation she performed in August 2017, as part

of a prior proceeding, in which she found Pulliam to be legally competent. She identified

Pulliam's mother, Linda Pulliam, as highly inconsistent in reporting her son's issues.

Michael Comte considered inconsistencies by Joshua Pulliam and Linda Pulliam

regarding Joshua's medical and social history. Pulliam stated that, in the last couple of

years, he had been hearing a female's voice that intoned: "[d]o me." RP at 443. Comte

opined that Pulliam may have been malingering, because Pulliam had not disclosed this

psychiatric symptom until after being charged in this prosecution. Comte also rejected Pulliam's allegations of sexual abuse, which Pulliam claimed happened at age five. To Dr. Erin Gorter-Hines, however, Pulliam reported sexual abuse at age thirteen. Comte suspected that Pulliam occasionally refused to take his medications.

Michael Comte dismissed Linda Pulliam's statement that Joshua Pulliam was diagnosed with autism, as insufficient clinical evidence supported this diagnosis. Joshua Pulliam informed Comte that he first drank alcohol between the ages of eight and ten and would drink for a week at a time, whereas Pulliam informed Dr. Erin Gorter-Hines that he began drinking alcohol at age fifteen and had only consumed on three occasions in total. Comte observed that Joshua "has a tendency to lie in both directions," opining that Joshua cannot "hang on to what reality is all the time." RP at 448.

Michael Comte's written opinion read:

> "If committed to a juvenile correctional facility, he [Joshua] will most likely test the limits in authority. He will not be reinforced. In my opinion, in time he will give up attempts to gain empowerment and control and allow counseling staff to influence, guide, and direct him."

RP at 458. Comte's opinion continued:

> "Although under the best of circumstances, it is difficult to predict the future, I believe Joshua can be significantly influenced by age 21 and will likely be at a reduced risk for future offending after that."

RP at 459.

Michael Comte identified challenges to treat Joshua Pulliam for the first few

9

months, but Pulliam would benefit from long term treatment. Comte testified that maintaining juvenile jurisdiction was in Pulliam's and the public's best interest. He expressed concern that adult prison would expose Pulliam to a criminal subculture with people exploiting and abusing him. Spending eighteen years in prison would harm Pulliam.

At the close of testimony at the declination hearing, the juvenile court delivered a detailed oral ruling declining jurisdiction. The court viewed Dr. Erin Gorter-Hines' evaluation of Joshua Pulliam to be the most comprehensive. The court opined that, while Michael Comte recognized the discrepancies in Pulliam's medical and social history, Comte's belief that these discrepancies were not substantial detracted from his report's credibility. The juvenile court noted that Comte lacked Pulliam's police reports and lacked the opportunity to interview Pulliam or his mother. The court also found, based on Pulliam's problems in detention and supervision and the inconsistencies in reports from him and his mother, five years in a juvenile facility, with no ongoing community supervision, would inadequately protect the public. Finally, the court determined that, whether it declined juvenile jurisdiction or not, Pulliam would receive identical treatment during his time at Green Hill.

During a later oral ruling during which Joshua Pulliam challenged proposed findings of fact, the juvenile court analyzed the eight factors from *Kent v. United States*, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). CP 144-59. The court

emphasized the importance of the public interest, factor eight in the analysis:

> So to suggest that there was one piece of this Court's ruling that gave any untoward weight and it was not again looking at the totality of the circumstances—and quite frankly, I could have relied solely on the fact that I believed that the public's best interests are protected by declining Mr. Pulliam and simply relied on that. I didn't because I—again, I'm going to stand by my original ruling that I think Mr. Pulliam is also going to be the one who does benefit long term from this.

RP at 577.

The juvenile court entered extensive written findings of fact and conclusions of

law. The findings included:

> . . .
> 38. More concerning than the number of priors, which includes misdemeanors and gross misdemeanors, is the reality that the respondent did not do well in following the conditions of release while charges were pending or while on probation after adjudication.
> 39. The respondent spent 70 days in detention during a seven-month period up until his arrest in November for violating conditions of release or probation violations.
> . . . .
> 41. Ms. Fluegge's quote was "'Josh marches to the beat of a different drum.'"
> 42. The respondent continued to show an increase in aggression at home and school.
> 43. While in detention, he also shown [sic] increased aggression even with the knowledge that the privileges he values, such as phone privileges and visits with family, would be lost.
> . . . .
> 47. While this factor [*Kent* factor six] is somewhat straight forward [sic], it is complicated by the respondent's mother's highly inconsistent reporting that is not backed up by actual records.
> . . . .
> 54. There has been some sexual abuse that was articulated, though not consistently, with one evaluator noting abuse at age 5 and the other

11

noting it age 13.

55. Also, there is inconsistent reporting dealing with the hearing of voices.

. . . .

76. There was also an evaluation by Dr. Gorter-Hines of the Child Study Treatment Center that was considered by the Court and found to be the most comprehensive evaluation of the respondent.

. . . .

90. Mr. Comte's report and testimony recognizes the above discrepancies in the information that the respondent's mother gave to other service providers, because he had Dr. Gorter-Hines's report available to him.

. . . .

93. Even though he [Comte] testified that he recognized the discrepancies in the information that he was provided, he opined that he did not consider the discrepancies to be substantial, even though the discrepancies related to anoxia, seizure history, sexual abuse, hearing voices, and the age and frequency of the respondent's use of alcohol.

94. This detracted from the credibility of Mr. Comte's report.

. . . .

102. Mr. Comte's opinion—that the respondent will take three months to acclimate to Green Hill Academy at Juvenile Rehabilitation ('JR'), after which time he will engage in meaningful treatment—is just an opinion.

. . . .

104. This Court can make a reasonable inference that the respondent will take a longer time to orient himself at Green Hill Academy based on his documented struggles with conditions of release, violations of probation, and problems while in detention.

105. There is no way to accurately predict how much time the respondent will spend in the Intensive Management Unit at JR for unwanted behavior that will prevent meaningful engagement in the services and treatment being offered at Green Hill Academy.

106. The respondent will receive identical treatment while at Green Hill Academy whether he is facing juvenile jurisdiction or adult jurisdiction.

. . . .

110. The respondent is also going to need additional time to catch up emotionally, for the difference in his emotional age and his chronological

age, as discussed by his mother and Mr. Comte.

111. If maintained in juvenile jurisdiction, there would be only a five year window with no ongoing community supervision.

112. The respondent's documented problems in detention and on supervision, the lack of records to back up assertions made by the respondent and his family, the conflicting information regarding the respondent's issues, and the lack of truthfulness demonstrated on an ongoing basis by the respondent lead to a reasonable inference that five years is simply not enough of a window to provide adequate rehabilitation that would, in turn, provide protection for the public upon release.

113. The adult system puts such safeguards in place.

114. The respondent will receive not only the same programming for the first five years at JR but will then extend his opportunities to work on those skills with additional programming opportunities for inmates at DOC who have similar backgrounds.

115. The adult system will provide a longer structured environment with the opportunity for booster sessions once reintegration is possible to help if the process is not going well, rather than "'21 and done'" at JR.

116. Not only would this court be placing the protection of the public at significant risk by allowing for "'21 and done,'" this court would also not be giving the respondent every opportunity to be successful once he is reintegrated into society.

117. Based upon the substantial documented needs of the respondent, it is in his best interests to be rehabilitated in the adult system.

118. It is clearly in the public's best interest from a safety standpoint to move the respondent to the adult jurisdiction which could require a lifetime community custody safety valve.

119. This factor [*Kent* factor eight]—the prospects for protecting the public and the likelihood of rehabilitating the juvenile—weighs in favor of moving the respondent to adult jurisdiction.

Clerk's Papers (CP) at 149-58.

The juvenile court entered two conclusions of law:

120. Considering the seven Kent factors that apply in this case, in light of all the evidence and testimony that has been presented, it is this Court's determination by a preponderance of the evidence that declination will be in the best interest of the juvenile and the public; therefore, the

respondent is remanded to the adult jurisdiction by order of this Court.

121. The Court's oral ruling delivered on the record is incorporated herein by reference.

CP at 158.

After juvenile court declination, the State in adult court, by second amended information, charged Joshua Pulliam with rape in the first degree, assault in the fourth degree, rape in the second degree, assault in the second degree, and felony harassment of another via threat to kill. Pulliam pled guilty to the charged crimes. When entering his guilty plea, Pulliam maintained his objection to the juvenile court's decision to decline jurisdiction. The adult court sentenced Joshua Pulliam to an indeterminate sentence of 200 months' to life.

## LAW AND ANALYSIS

On appeal, Joshua Pulliam argues: (1) the evidence does not support the juvenile court's findings regarding Michael Comte's consideration of inconsistencies, (2) the defective findings regarding Comte impacted the juvenile court's evaluation of *Kent* factor six, (3) the evidence does not support the juvenile court's finding regarding Pulliam's treatment options and responses to interventions, (4) the juvenile court's defective findings impacted its evaluation of *Kent* factor eight, and (5) the inadequate evaluation of factors six and eight led to a mistaken decision to decline jurisdiction. Pulliam also asserts cumulative error.

RCW 13.40.110(3) governs when a juvenile court may decline jurisdiction:

The court after a decline hearing may order the case transferred for adult criminal prosecution upon a finding that the declination would be in the best interest of the juvenile or the public. The court shall consider the relevant reports, facts, opinions, and arguments presented by the parties and their counsel.

A juvenile court's decision on whether to decline jurisdiction is discretionary and reversible only if this court finds that the juvenile court abused its discretion. *State v. M.A.*, 106 Wn. App. 493, 498, 23 P.3d 508 (2001). A juvenile court abuses its discretion when it exercises it on a ground, or to an extent, clearly untenable or manifestly unreasonable. *State v. M.A.*, 106 Wn. App. at 498.

When considering whether to decline jurisdiction, the juvenile court must consider eight factors outlined by the United States Supreme Court in *Kent v. United States*, 383 U.S. 541, 566-67 (1966). The *Kent* factors include:

(1) the seriousness of the alleged offense and whether the protection of the community requires waiver; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the alleged offense was against persons or against property; (4) the prosecutive merit of the complaint; (5) the desirability of juvenile trial and disposition of the entire offense in one court when the juvenile's accomplices in the alleged offense are adults; (6) the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living; (7) the juvenile's record and previous history; and (8) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court.

15

*State v. M.A.*, 106 Wn. App. at 497-98 (footnotes omitted).  Although not all eight of the

*Kent* factors must be proven in order to justify declination, the juvenile court abuses its

discretion when it does not consider all eight factors.  *State v. M.A.*, 106 Wn. App. at 498.

In support of his arguments, Joshua Pulliam assigns error to the following findings

of fact: 38-39, 41-43, 47, 53-55, 76, 90, 93-94, 102, 104-106, 110-119.  Pulliam further

argues that substantial evidence fails to support conclusions of law 120 and 121.  We

earlier quoted the challenged findings of fact and conclusions of law.

This court will not disturb the juvenile court's factual findings if substantial

evidence supports them.  *State v. M.A.*, 106 Wn. App. at 498.  Evidence is substantial

when it is of sufficient quantity to persuade a fair-minded, rational person of the truth of

the allegation.  *State v. Ware*, 111 Wn. App. 738, 742, 46 P.3d 280 (2002).  To determine

whether substantial evidence supports the juvenile court's decision, this court examines

the entire record, including the court's oral opinion.  *State v. M.A.*, 106 Wn. App. at 498.

This court treats unchallenged findings of fact as verities on appeal.  *State v. Stenson*, 132

Wn.2d 668, 697, 940 P.2d 1239 (1997).

Michael Comte's Consideration of Inconsistencies

The juvenile court found that Joshua Pulliam and his mother Linda reported

inconsistent facts to different mental health care professionals.  The inconsistencies

included Joshua's alcohol consumption, hearing of voices, and sexual abuse.  The

juvenile court inferred from this evidence that the Pulliams reported new information to

Michael Comte that they did not report to Dr. Erin Gorter-Hines in an attempt to skew Comte's report in favor of juvenile jurisdiction.

Joshua Pulliam argues that the juvenile court's findings of fact relating to Michael Comte's testimony and report are unsupported by substantial evidence. Nevertheless, in his brief, Pulliam concedes that he and his mother reported facts inconsistent with facts reported to other professionals and even inconsistently reported facts to Michael Comte. Pulliam further agrees that he and his mother attempted to skew the opinions of Comte by providing him false information and that Comte concluded that Pulliam and his mother misled him.

Joshua Pulliam's challenge to the trial court's findings consists more of a challenge to inferences drawn by the court from the underlying evidence rather than an assertion to a lack of supporting evidentiary facts. Pulliam objects to the court's extrapolation that, when Michael Comte rendered his opinions, Comte failed to adequately consider Pulliam's manipulation and lack of credibility. In turn, Pulliam challenges the trial court's choosing of the opinions of one expert over another expert. The trial court decided to base its conclusions more on the opinions rendered by Dr. Erin Gorter-Hines. We discern no error in the court accepting Dr. Gorter-Hines' opinions instead. The credit to be given to any expert opinion testimony is quintessentially a matter for the trier of fact to determine. *Strauss v. Premera Blue Cross*, 194 Wn.2d 296,

17

No. 36531-0-III
*State v. Pulliam*

302, 449 P.3d 640 (2019); *Grove v. PeaceHealth St. Joseph Hosp.*, 182 Wn.2d 136, 146, 341 P.3d 261 (2014).

Kent Factor Six: The Juvenile's Sophistication and Maturity

In deciding whether to decline juvenile jurisdiction, the juvenile court must consider, along with all seven other factors, *Kent* factor six addressing the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living. *State v. M.A.*, 106 Wn. App. 493, 497-98 (2001). In finding of fact 63, the juvenile court found that *Kent* factor six weighed in Joshua Pulliam's favor.

On appeal, Joshua Pulliam contends that, although the juvenile court resolved *Kent* factor six in his favor, the court's erroneous findings of fact relating to Michael Comte's evaluation resulted in this factor weighing less in Pulliam's favor than it would have if the court entered findings supported by substantial evidence. Nevertheless, as analyzed above, the findings of fact relating to Michael Comte's evaluation were sufficient. Although Pulliam assigned error to those findings, his argument did not challenge the findings. We question whether the accused may ever successfully challenge the trial court's weighing of a *Kent* factor, when the court deems the factor to favor the accused. Nevertheless, we find no error in the trial court's handling of factor 6 when the facts supported the trial court's use of the factor.

Joshua Pulliam's Treatment Options and Responses to Intervention

18

Joshua Pulliam next asserts that the juvenile court entered insufficient findings relating to his treatment options and his responses to previous time spent in juvenile detention. Pulliam challenges the court's findings that: (1) he would receive identical treatment opportunities during his first five years at Green Hill regardless of whether the court declined jurisdiction, (2) he acted inappropriately following his release pending charges and while on probation after adjudication of his prior convictions, (3) he showed increased aggression at home, at school, and in detention, and (4) he would not respond well to continuous treatment available in juvenile detention for the next five years if the juvenile court retained jurisdiction. We address these discrete contentions in such order.

*A. Identical Treatment*

Joshua Pulliam challenges the following findings of fact:

> 106. The respondent will receive identical treatment while at Green Hill Academy whether he is facing juvenile jurisdiction or adult jurisdiction.
> . . . .
> 114. The respondent will receive not only the same programming for the first five years at JR but will then extend his opportunities to work on those skills with additional programming opportunities for inmates at DOC who have similar backgrounds.

CP at 156-57. Nevertheless, ample testimony supported these two findings.

Joshua Pulliam highlights that, under adult jurisdiction, he would lack the opportunity to transition to a group home or parole after his twenty-first birthday. He

19

also emphasizes that he could be transferred to DOC before he turned twenty-one years old.

The juvenile court noted that, while Joshua Pulliam remained at Green Hill, his treatment would be identical to that of one sentenced in juvenile court. The juvenile court did not find that Pulliam's treatment would remain identical once he transferred to the DOC. Furthermore, as the State argues, while Pulliam could be transferred to DOC early, the transfer would result from his behavior at Green Hill. Additionally, according to DOC Treatment Coordinator Cathi Harris, Joshua Pulliam has the chance to seek sex offender treatment during the final twelve to twenty-four months of his sentence.

*B. Probation Performance*

Joshua Pulliam next argues that the juvenile court entered three findings of fact based on a misunderstanding of witness testimony regarding his prior court contacts. Pulliam challenges the following findings of fact:

> 38. More concerning than the number of priors, which includes misdemeanors and gross misdemeanors, is the reality that the respondent did not do well in following the conditions of release while charges were pending or while on probation after adjudication.
> 39. The respondent spent 70 days in detention during a seven-month period up until his arrest in November for violating conditions of release or probation violations.
> . . . .
> 41. Ms. Fluegge's quote was "'Josh marches to the beat of a different drum.'"

CP at 149. Pulliam does not challenge finding of fact 38 insofar as it states that his

number of prior convictions causes concern. Additionally, he only challenges finding of

fact 41 inasmuch as it suggests that the court believed Paula Fluegge's statement referred

to his lack of success on probation.

The three findings of fact relate to the juvenile court's analysis for *Kent* factor

seven, Joshua Pulliam's prior criminal record and history. *State v. M.A.*, 106 Wn. App.

493, 498 (2001). In its findings, the juvenile court labeled its analysis of factor seven as

factor four and vice versa. *Kent* factor four relates to the prosecutive merit of the

complaint against the juvenile. *State v. M.A.*, 106 Wn. App. at 497. We deem the

confusion to constitute a scrivener's error that does not detract from the juvenile court's

analysis.

The juvenile court found that *Kent* factor seven weighed in Joshua Pulliam's

favor:

> 44. Even though the Court is concerned about this factor, the
> respondent's prior criminal history weighs in favor of retaining juvenile
> jurisdiction.

CP at 150.

Joshua Pulliam contends that the juvenile court misunderstood his probation

counselor, Paula Fluegge's, testimony. Fluegge testified that Pulliam did not graduate

from the WISe program due to being arrested for the crimes charged in this matter.

Fluegge indicated that Pulliam violated his probation twice, once when failing to obey his

21

mother's home rules by leaving the house as he pleased and once when his mother found drugs in his room. According to Fluegge, Pulliam "just marches to a different drum than what other kids do." RP at 232.

Using juvenile assessment tools, Paula Fluegge determined Joshua Pulliam to be at moderate risk for reoffending, but his risk level increased since his re-offense. Nonetheless, Fluegge opined that Pulliam was amenable to treatment, because he completed random drug tests and attended scheduled sessions in his diversion programs.

Joshua Pulliam argues that, when Paula Fluegge stated that he "'re-offended again,'" she was "referring to minor offenses unrelated to the pending charges." Amended Br. of Appellant at 32. Pulliam fails to explain why Fluegge's opinion as to his likelihood of reoffending should be diminished due to the type of violations he committed.

The juvenile court determined that Joshua Pulliam did not follow his probation conditions after his prior adjudications. The juvenile court noted Paula Fluegge's decision to increase Pulliam's risk level from moderate to high. The juvenile court found Pulliam's poor probation performance significant. Nevertheless, despite its concerns, the juvenile court resolved *Kent* factor seven, labeled in its findings as *Kent* factor four, in Pulliam's favor. Substantial evidence supports the juvenile court's findings regarding Joshua Pulliam's poor probation performance.

### C. Increased Aggression

Joshua Pulliam asserts that evidence did not support the juvenile court's findings of fact related to his increased aggression at home, in school, and in detention. Pulliam contends that, based on these findings, the juvenile court erroneously concluded that he would not be amenable to treatment in juvenile detention. Pulliam argues that his adolescence and abrupt removal from phenobarbital resulted in his behavioral changes.

Joshua Pulliam and his mother maintained that Pulliam took phenobarbital to control his seizures and that he took this medication consistently until being placed in juvenile detention in 2017. Pulliam's mother noted that his behavior had changed after being taken off of phenobarbital, stating that "he was getting in trouble right and left for everything." RP at 374. Before Pulliam's hearing, Michael Comte did not know that Pulliam "was taken off of his phenobarbital without being—apparently without being tapered off his phenobarbital, which, oooh, can be really scary." RP at 431. Pulliam contends that being suddenly taken off phenobarbital contributed heavily to his increased aggression.

The trial record demonstrates that a provider prescribed phenobarbital to Joshua Pulliam. Aside from the Pulliams' testimony, the record establishes that Pulliam took this medication for a significant period before entering juvenile detention. Nevertheless, Yakima County's records list the current medications Pulliam took while in juvenile detention: sertraline for depression, oxcarbazine for seizures, guanfacine for ADHD,

23

clonidine for anxiety, aripiprazole for major conduct disorder, and an albuterol inhaler for asthma. Phenobarbital is not listed. Furthermore, when defense counsel asked Yakima County juvenile detention manager Steve Driscoll when Pulliam was taken off of phenobarbital, Driscoll replied that he did not know Pulliam took the medication and communications from detention staff to Pulliam's doctors indicated that he had not taken the medication for years. Thus, the record supports a finding that Pulliam had not been taking phenobarbital on entering juvenile detention.

Dan Behler, a juvenile probation officer, recommended declining juvenile jurisdiction. In support of his decision, Behler cited Joshua Pulliam's aggressive attacks of the victims, including how Pulliam overpowered them, struck them, and went for the victims' head or throat during his surprising assaults. These actions occurred before Pulliam's confinement, when he and his mother alleged that he regularly took phenobarbital. Even if, as Pulliam argues, he had been taking his medication consistently when he committed these crimes, this evidence harms his argument.

If Joshua Pulliam aggressively attacked three women, while on phenobarbital, Pulliam's attack of a fellow juvenile while in detention likely would have occurred irrespective of his suddenly ceasing the medication. Dan Behler described this attack. In addition, in December 2017, Pulliam spoke with his grandmother over the phone. Pulliam indicated that he had been hit in the nose and that he was "going to beat the shit out of" someone, presumably the person who hit Pulliam. RP at 321. Pulliam

24

subsequently told his grandmother that he would likely lose his phone privileges. Soon after, Pulliam attacked another juvenile with a headlock, dragged the juvenile to the ground, and punched him several times before an officer intervened.

In short, substantial evidence supports the juvenile court's findings related to Joshua Pulliam's aggression.

### D. Continuous Treatment

The juvenile court's finding of fact 39 declares that Joshua Pulliam spent seventy days in detention during a seven-month period until his arrest in November for violating conditions of release or probation violations. Pulliam construes this finding as suggesting that his period of confinement was continuous, not intermittent, or that his prior custody indicated that his future treatment in a juvenile facility would be ineffective over the next five years, if the juvenile court retained jurisdiction.

We agree with Joshua Pulliam that he spent time in and out of detention, rather than being held continuously for seventy days. Nevertheless, the juvenile court did not find that Pulliam spent seventy continuous days in confinement, particularly since the juvenile court wrote that Pulliam spent seventy days in incarceration over the course of seven months. Seven months contains more than seventy days.

Joshua Pulliam claims that, if he received continuous treatment for an extended period, he would have responded well. He observes that, according to John Scott, Green Hill's sex offender treatment coordinator, group therapy courses run in 16-week cycles.

25

Because Pulliam's longest prior stint in custody would not have allowed him to complete half of one 16-week program, he argues that the treatment he received was substantially disrupted over his time in and out of custody.

Joshua Pulliam's contention assumes that, during his prior period of confinement, he spent time at Green Hill. The record does not support this fact. Rather, Pulliam was incarcerated at the juvenile detention center in Yakima County. Thus, Pulliam could not have accessed the treatment options that Green Hill offers.

Joshua Pulliam did not respond well to treatment intervention during his intermittent confinement across seven months. Although Green Hill would afford Pulliam more aggressive treatment options, he remained unamenable to treatment during his previous incarceration periods. The record supports that Pulliam will require more time to rehabilitate than five years, the maximum stay in the juvenile system. Thus, the juvenile court did not err in finding that Pulliam's prior court interventions were representative of his future treatment amenability.

*Kent* Factor Eight: Protecting the Public and Rehabilitating Joshua Pulliam

The juvenile court resolved *Kent* factor eight in favor of declining jurisdiction because adult court would both protect the public and assist in Joshua Pulliam's rehabilitation. Pulliam argues that the findings of fact that he previously challenged infected the juvenile court's consideration of *Kent* factor eight and its decision to decline jurisdiction.

*Kent* factor eight requires the juvenile court to consider "the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court." *State v. M.A.*, 106 Wn. App. 493, 498 (2001) (footnote omitted). We have already determined that substantial evidence supports all of the juvenile court's findings that Joshua Pulliam challenges. The juvenile court gave due consideration to each *Kent* factor and found that declination is in both the public's and Pulliam's best interests by a preponderance of the evidence. The juvenile court did not abuse its discretion by remanding Pulliam to adult court jurisdiction.

Cumulative Error

Joshua Pulliam also contends that cumulative error led to the juvenile court's declination of jurisdiction. Since we find no error, the cumulative error doctrine does not apply.

CONCLUSION

We affirm the juvenile court's declination of jurisdiction and, in turn, the adult court convictions of Joshua Pulliam.

27

No. 36531-0-III
*State v. Pulliam*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Staab, J.