# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of: | No. 54645-1-II |
| Z.L., | UNPUBLISHED OPINION |
| Petitioner. | |

MAXA, J. – ZL appeals the trial court's order committing him to involuntary treatment for up to 180 days under chapter 71.05 RCW after a jury found that he was "gravely disabled" as a result of a mental disorder as defined by former RCW 71.05.020(22) (2019).

We hold that (1) the trial court did not err when it admitted evidence regarding ZL's Type 1 diabetes because his ability to manage his diabetes was relevant to whether he was gravely disabled as a result of a mental disorder; and (2) the trial court erred when it allowed an expert witness to testify that his opinions were supported by clear, cogent and convincing evidence, but that the error was harmless. Accordingly, we affirm the order committing ZL to involuntary treatment for 180 days.

## FACTS

*Background*

At the time of his involuntary commitment, ZL was a 37-year-old man with schizophrenia and antisocial personality disorder. ZL also had Type 1 diabetes, which meant that his body could not make insulin on its own. As a result, ZL relied on regular insulin injections and blood sugar checks, along with a controlled diet. ZL initially was committed for

90 days at Western State Hospital (WSH) in October 2019 pursuant to a superior court commissioner's order.

*Petition for Involuntary Treatment*

In December 2019, Dr. Susan Lin and Dr. Leslie Sziebert at WSH filed a petition in superior court for involuntary treatment for an additional 180 days on the grounds that ZL remained gravely disabled as a result of a mental disorder. In March 2020, Dr. Lin and Dr. Sziebert filed an amended petition, adding that ZL also had threatened, attempted, or inflicted physical harm upon another person or substantial damage to another's property and therefore presented a likelihood of serious harm.

*Jury Trial*

ZL requested a jury trial. Before the trial started, ZL filed a motion to exclude all testimony regarding his Type 1 diabetes. The trial court denied the motion.

At the commitment trial, Sabrina Bauer, a registered nurse who worked with ZL, testified that she had witnessed ZL be verbally and physically aggressive with other people at WSH. Bauer watched ZL punch another patient in the back of her head, make verbal threats to the patient, and spit on the patient and on other staff members. Bauer also explained that ZL was not compliant 80 percent of the time for his blood sugar checks relating to his diabetes.

Dr. Lin testified that she was ZL's treating psychologist. She stated that ZL's primary diagnosis was schizophrenia, which caused him to have grandiose delusions such as believing that he owned mansions and several law firms, had won several Grammy awards, and had cured acquired immunodeficiency syndrome (AIDS). Dr. Lin stated that ZL's secondary diagnosis was antisocial personality disorder. Dr. Lin testified that ZL's demeanor fluctuated from speaking cordially and coherently to speaking to no one in particular. She stated that ZL generally knew

where he was and what day it was, but that he did not believe that he was supposed to be at WSH. She noted that ZL had some cognitive and volitional control over his behavior and that he was able to tend to his hygiene.

Dr. Lin opined that ZL was not ready for discharge and that he was gravely disabled as a result of his mental illness because "he would not be able to take care of his own health and safety needs" without support from WSH. 2 Report of Proceedings (RP) at 124. Dr. Lin explained that WSH staff had to prompt ZL several times a day to get out of bed, to eat his meals, and to take his medications. She emphasized that it was necessary for ZL to eat because of his Type 1 diabetes. She stated that if ZL stopped taking his antipsychotropic medications, his psychiatric symptoms would be exacerbated and he would become more aggressive. Finally, Dr. Lin opined that ZL presented a likelihood of serious harm to himself or others.

Dr. Sziebert testified that he was a psychiatrist and that he was the head of ZL's treatment team. He testified that ZL suffered from schizophrenia and antisocial personality disorder and that he exhibited grandiose delusions and auditory hallucinations. However, ZL did not accept the fact that he had a major psychiatric diagnosis.

Dr. Sziebert also stated that ZL had Type 1 diabetes, which was different than Type 2 diabetes. Specifically, he explained that as a Type 1 diabetic individual, ZL had to be 100 percent compliant with his prescribed medications and treatments, especially blood sugar checks, and had to eat appropriate foods because his body could not create insulin by himself. Dr. Sziebert stated that ZL sometimes was not compliant with his blood sugar checks and insulin injections. He also stated that ZL mostly was non-compliant with his dietary needs. Dr. Sziebert struggled to control ZL's diabetes even in the very structured environment of WSH.

Dr. Sziebert testified that ZL's control of his diabetes was connected to his mental condition. Because of ZL's grandiosity, his attitude was "[r]ules don't apply to me, and if I feel like doing it, it's okay." 2 RP at 219. Dr. Sziebert opined that ZL was gravely disabled because he was unable to manage his diabetes and that failure to control his diabetes could result in the loss of a leg or arm or even death. Dr. Sziebert also testified that he believed that ZL presented a likelihood of repeated acts of violence to a reasonable degree of scientific certainty.

The State then asked Dr. Sziebert whether his opinion that ZL was not ready for discharge was based on a clear, cogent, and convincing degree of certainty, and he agreed. Dr. Sziebert also agreed that his opinions that ZL had a mental condition and that he was gravely disabled were "by clear, cogent, and convincing evidence." 2 RP at 188-89. ZL objected to each of the questions that referenced clear, cogent and convincing evidence, but the trial court overruled the objections.

As part of the jury instructions, the trial court instructed the jury that they were the "sole judges of the credibility of the witness" and the "value or weight to be given to the testimony of each witness." Clerk's Papers at 67. The court also instructed the jury that the petitioners had the burden to prove each element of their case by clear, cogent, and convincing evidence.

The jury found that ZL had a mental disorder and was gravely disabled as a result of a mental disorder. The jury also found that ZL had threatened, attempted, or inflicted physical harm upon another or himself or substantial damage upon another's property and that as a result of his mental disorder, he presented a likelihood of serious harm to himself, others, or property of another. The trial court entered an order to involuntarily treat ZL for up to 180 days.

ZL appeals the trial court's order.

4

ANALYSIS

A.    INVOLUNTARY TREATMENT ACT

The involuntary treatment act (ITA), chapter 71.05 RCW, governs the temporary detention for evaluation and treatment of persons with mental disorders.

Former RCW 71.05.320(4) (2018) provides that after the initial commitment period, the person in charge of the facility in which a person is committed may file a new petition for involuntary treatment on various grounds. Relevant here, a new petition may be filed on the grounds that he or she continues to be gravely disabled. Former RCW 71.05.320(4)(d). Former RCW 71.05.020(22)[1] defines "gravely disabled" as a condition in which a person, because of a mental disorder:

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

This statute provides two alternative definitions of "gravely disabled," and either provides a basis for involuntary commitment. *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138 (1986).

In addition, a new petition for involuntary treatment may be filed when a person who:

> (a) During the current period of court ordered treatment: (i) Has threatened, attempted, or inflicted physical harm upon the person of another, or substantial damage upon the property of another, and (ii) as a result of a mental disorder, substance use disorder, or developmental disability *presents a likelihood of serious harm*.

Former RCW 71.05.320(4)(a) (emphasis added). The term "likelihood of serious harm" means:

> (a) A substantial risk that . . . (ii) physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by a person upon the property of others, as evidenced

---

[1] This definition currently is codified at RCW 71.05.020(24).

by behavior which has caused substantial loss or damage to the property of others; or

(b) The person has threatened the physical safety of another and has a history of one or more violent acts.

Former RCW 71.05.020(35) (2019).

To support an involuntary commitment, a person's grave disability or likelihood of serious harm must be as a result of a "mental disorder." Former RCW 71.05.320(4)(a); former RCW 71.05.020(22). "Mental disorder" is defined in RCW 71.05.020(37)[2] to mean "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions."

In a civil commitment proceeding, the State has the burden of proving that a person is gravely disabled or presents a likelihood of serious harm by clear, cogent, and convincing evidence. Former RCW 71.05.310 (2012); *Labelle*, 107 Wn.2d at 208-09. This standard means that the State must show that the ultimate fact in issue is "highly probable." *Labelle*, 107 Wn.2d at 209.

Even though ZL's period of involuntary commitment has passed, the appeal of an involuntary commitment order is not moot because such an order may have collateral consequences in future proceedings. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 76-77, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019).

B.       RELEVANCE OF DIABETES

ZL argues that the trial court erred when it failed to exclude expert testimony on ZL's ability to manage his diabetes by himself. He argues that a person cannot be considered "gravely

---

[2] Although other portions of RCW 71.05.020 were amended in 2020, subsection (37) was not. Therefore, we cite to the current version of that subsection.

disabled" based on an inability to care for a physical medical condition such as diabetes, rather than common human needs such as hygiene, food, and shelter. We disagree.

1. Legal Principles

Under ER 402, only relevant evidence is admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Whether evidence is relevant is a low bar; even minimally relevant evidence is admissible. *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 729, 315 P.3d 1143 (2013).

We review a trial court's decision to admit evidence for an abuse of discretion. *In re Det. of West*, 171 Wn.2d 383, 396, 256 P.3d 302 (2011).

2. Analysis

As stated above, there are two definitions of "gravely disabled" under former RCW 71.05.020(22). ZL focuses on the definition under former RCW 71.05.020(22)(a), which provides that a person is gravely disabled as a result of a mental disorder when he or she "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." In addition, one of the requirements in former RCW 71.05.020(22)(b) is that the patient will fail to receive treatment that is essential for health or safety, which includes that the patient would not receive such care if released. *LaBelle*, 107 Wn.2d at 208.

First, ZL argues that Dr. Sziebert improperly based his opinion that ZL was gravely disabled on a physical disorder – his diabetes – rather than on a mental disorder. However, Dr. Sziebert testified that ZL's mental disorder was connected to his control of his diabetes because his grandiosity caused him to believe that the rules did not apply to him and he could do anything he felt like doing. In addition, even in the structured environment of WSH, ZL often was not

compliant with his blood sugar checks, insulin injections, and dietary needs. The inference from this testimony is that if released, his mental disorder would cause him to discontinue the medication and proper eating habits necessary to control his diabetes. Therefore, the evidence supports a finding that ZL would neglect his diabetes because of his mental disorder.

Second, ZL argues that the "essential human needs" referenced in former RCW 71.05.020(22)(a) refers to only those needs common to all humanity in order to survive, such as food, clothing, and shelter. However, in *LaBelle*, the Supreme Court expressly included "medical treatment" as an example of an essential human need. 107 Wn.2d at 205. In addition, ZL's narrow interpretation is contrary to the purpose of the ITA – "[t]o protect the health and safety of persons suffering from behavioral health disorders." RCW 71.05.010(1)(a). Here, it is impossible to separate ZL's ability to care for his essential human needs from his ability to control his diabetes because both are required for the sake of his overall health and safety.

ZL's diabetes and his ability to manage his diabetic condition was directly relevant to the issue of whether he was gravely disabled as a result of a mental disorder. Accordingly, we hold that the trial court did not err when it admitted evidence regarding ZL's diabetes.

C.      EXPERT TESTIMONY REGARDING CLEAR, COGENT, AND CONVINCING STANDARD

ZL argues that the trial court erred when it allowed Dr. Sziebert to testify that clear, cogent, and convincing evidence supported his opinions. ZL claims that the error violated his right to a jury trial. We agree, but we hold that the error was harmless.

1.      Legal Principles

ER 702 provides that a court may permit a witness qualified as an expert to provide an opinion regarding scientific or specialized knowledge if such testimony may assist the trier of

fact. "Admission is proper provided the expert is qualified and his or her testimony is helpful." *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016).

To be admissible, expert medical testimony must be based on reasonable medical probability or reasonable medical certainty – the terms are used interchangeably. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 606-07, 260 P.3d 857 (2011). This rule applies to expert opinion testimony concerning a person's mental status. *In re Det. of Twining*, 77 Wn. App. 882, 891, 894 P.2d 1331 (1995), *abrogated on other grounds by In re Det. of Pouncy*, 168 Wn.2d 382, 229 P.3d 678 (2010).

ER 704 provides that an opinion that is otherwise admissible is not objectionable when it states an ultimate issue of fact to be decided by the trier of fact. However, experts may not offer legal conclusions in their testimony or merely tell the jury what result to reach. 5B KARL B. TEGLAND, WASHINGTON PRACTICE SERIES: EVIDENCE LAW AND PRACTICE § 704.5, at 271 (6th ed. 2016); *see also State v. Haq*, 166 Wn. App. 221, 263, 268 P.3d 997 (2012); *Stenger v. State*, 104 Wn. App. 393, 407-09, 16 P.3d 655 (2001). Only the trier of fact may determine the weight and credibility of an expert's testimony. *Grove v. PeaceHealth St. Joseph Hosp.*, 182 Wn.2d 136, 146, 341 P.3d 261 (2014).

"[T]rial courts are afforded wide discretion, and trial court expert opinion decisions will not be disturbed on appeal absent an abuse of such discretion." *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 355, 333 P.3d 388 (2014). Therefore, a trial court's ruling on the admissibility of evidence will only be overturned when the decision was manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons. *Gregg Roofing*, 178 Wn. App. at 728.

9

2. Analysis

Here, the State's attorney asked Dr. Sziebert's about his degree of certainty regarding his opinion that ZL was ready to be discharged:

Q: . . . And I take it that [ZL] isn't ready for discharge at the current time?
. . .

A: No, I don't think he's ready for discharge.
Q: Can you state that with any degree of certainty?
A: Yes.
Q: More likely than not?
A: More certain than more likely than not.
Q: Clear, cogent, and convincing?
A: At least.
Q: At least clear, cogent, and convincing that he's not ready for discharge?
A: Yes.

2 RP at 187-88.

It is not necessarily improper to ask an expert witness how certain he or she is of an expressed opinion. However, "clear, cogent, and convincing" does not relate to a level of certainty. Instead, that phrase refers to a level of *evidence* that satisfies the State's burden of proof. *See* former RCW 71.05.310 ("The burden of proof shall be by clear, cogent, and convincing evidence."); *Labelle*, 107 Wn.2d at 209 ("The burden of proof at 90-day or 180-day involuntary commitment proceedings is by clear, cogent and convincing evidence."). The State essentially was asking Dr. Sziebert whether clear, cogent, and convincing evidence supported his opinion.

Subsequent questions more specifically referred to evidence. The State asked Dr. Sziebert whether "clear, cogent, and convincing" *evidence* supported his opinions:

Q: Would you have any opinion as to whether he has a mental condition by clear, cogent, and convincing *evidence* as well?
A: Yes.
. . .

10

> Q: And do you think that he's gravely disabled as a result of his mental condition by clear, cogent, and convincing *evidence*?
> A: I do.

2 RP at 188-89 (emphasis added).

We hold that all three questions referencing the clear, cogent, and convincing standard were improper. Under ER 704, it was proper for Dr. Sziebert to testify on ultimate issues of fact, such as whether ZL had a mental condition and was gravely disabled as a result of his mental condition. But Dr. Sziebert's personal belief that clear, cogent, and convincing evidence supported his opinions on these ultimate issues of fact directly invaded the jury's province to weigh the evidence. By mimicking the legal requirement for the State's burden of proof, Dr. Sziebert crossed the line between helping the jury understand the evidence and instructing the jury on what result to reach.

The State argues that there is no bright line answer as to what is admissible under ER 704 and as a result, appellate courts defer to trial courts absent an abuse of discretion. The State also argues that it is necessary for an expert to quantify the extent to which he or she is certain of his or her opinion in order to be admissible as expert testimony. But as stated above, only the jury may decide whether an expert's testimony supports the conclusion that the evidence in the case meets the clear, cogent, and convincing standard. *See* 5B TEGLAND, § 704.5, at 271 ("No witness is permitted to express an opinion that is a conclusion of law or merely tells the jury what result to reach.").

Accordingly, we hold that the trial court erred when it failed to sustain ZL's objections to the testimony at issue.

3. Harmless Error

An erroneous evidentiary ruling is not grounds for reversal unless the error was prejudicial and not harmless. *Barriga Figueroa v. Prieto Mariscal*, 193 Wn.2d 404, 415, 441 P.3d 818 (2019). "The test for harmless error is whether there is a reasonable probability that the error materially affected the outcome of the trial." *Frantom v. State*, 12 Wn. App. 2d 953. 959, 460 P.3d 1100 (2020).

As stated above, former RCW 71.05.020(22)(a) states that a person is considered "gravely disabled" when he or she "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." Alternatively, a person also can meet the definition of "gravely disabled" when a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Former RCW 71.05.020(22)(b).

Here, Dr. Sziebert provided extensive, unrefuted testimony that explained why he believed that ZL was gravely disabled based on ZL's schizophrenia and his inability to control his Type 1 diabetes outside the confines of WSH. And Dr. Sziebert expressly stated his opinion that ZL was gravely disabled and the basis for that opinion earlier in his testimony, long before he was asked about clear, cogent, and convincing evidence.

In addition, Bauer and Dr. Lin testified in support of the petition to involuntarily commit ZL. Bauer testified about specific events where ZL exhibited physical or verbal aggression towards other people and how ZL was not compliant 80 percent of the time for his blood sugar checks. Dr. Lin testified that ZL had grandiose delusions that he owned mansions and law firms, had won several Grammy awards, and had cured AIDS. Dr. Lin opined that ZL was gravely

disabled because he lacked the ability "to take care of his own health and safety needs" and that he needed to be prompted several times a day to get out of bed, eat his meals, and to take his medications. 2 RP at 124.

Accordingly, we conclude that any error that arose out of Dr. Sziebert's testimony was harmless.

CONCLUSION

We affirm the trial court's commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
LEE, C.J.

_____
SUTTON, J.